FRANK RUDY HEIRS ASSOCIATES,  )
                               )
        Plaintiff/Appellee,    )
                               )        Appeal No.
                               )        01-A-01-9505-CH-00219
VS.                            )
                               )        Davidson Chancery
                               )        No. 93-2957-II
MOORE & ASSOCIATES, INC., LEON )
MOORE, AND SHOLODGE, INC.,     )
                               )
        Defendants/Appellants. )

FILED

Nov. 29, 1995

Cecil Crowson, Jr.
Appellate Court Clerk

COURT OF APPEALS OF TENNESSEE
MIDDLE SECTION AT NASHVILLE


APPEALED FROM THE CHANCERY COURT OF DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

THE HONORABLE C. ALLEN HIGH, CHANCELLOR



CHARLES PATRICK FLYNN
GERALD D. NEENAN
Suite 800, Noel Place
200 Fourth Avenue North
Nashville, Tennessee  37219
        Attorneys for Plaintiff/Appellee

PETER H. CURRY
TUKE, YOPP & SWEENEY
201 4th Avenue North
Third National Bank Building
17th Floor
Nashville, Tennessee  37219-2040
        Attorney for Defendants/Appellants



AFFIRMED AND REMANDED



                                    BEN H. CANTRELL, JUDGE


CONCUR:
TODD, P.J., M.S.
KOCH, J.

# O P I N I O N

The general partner in a hotel-keeping operation refused to make distributions to the limited partner from the revenues of the venture. The limited partner filed suit against the general partner for breach of contract and breach of fiduciary duty. The trial court found that the general partner had breached the partnership agreement, and rendered a partial summary judgment, ordering an immediate distribution to both partners of over $680,000. We affirm.

## I.

Four members of the Rudy family inherited a piece of land on Music Valley Drive in Nashville, a popular tourist area. In 1986, Gulf Coast Development, Inc. (GCD), an owner and operator of Shoney's Inns, proposed to buy the property and erect a hotel on it. The heirs did not want to give up the property, and so the parties entered into a limited partnership agreement by which GCD was able to build a Shoney's Inn on the property, and the Rudy heirs acquired a 40% interest in the proposed hotel enterprise, as well as a $40,000 a year ground lease agreement for the use of the land.

Gulf Coast Development became the general partner, and retained a 60% interest. The partnership was called Shoney's Inn of Opryland, Ltd. The name was later changed to Shoney's Inn of Music Valley, Ltd., and GCD later became ShoLodge, Inc. The August 4, 1986 partnership agreement recited that its execution coincided with the activation of a management agreement between the partnership and the general partner, whereby the general partner would receive a fee of 6% of revenues for managing the affairs of Shoney's Inn of Opryland.

The agreement also referenced a construction contract to build the hotel. The firm chosen to build the hotel was Moore & Associates, a company wholly owned by Leon Moore, who also held a majority interest in Gulf Coast Development. In the "Abbreviated Form of Agreement Between Owner and Contractor," found in the record, Leon Moore is the signatory for both parties to the contract.

The terms of the construction contract were summarized in the partnership agreement as follows:

> "The partnership has entered into or will enter into a construction contract with Moore & Associates, Inc. ("the Contractor"), an affiliate of the General Partner, whereby the Contractor will agree to construct the Inn for an amount equal to the Contractor's cost plus 5 percent (5%) overhead plus ten percent (10%) profit, but in any event not greater than $5,885,000 . . . . Each of the partners hereby consents to the foregoing terms of such construction contract."

The current dispute was set in motion by construction cost overruns of about $1,800,000 above the $5,885,000 stipulated by the above contract clause.

Before discussing the effect of these overruns, we note in passing that the agreement provided for other fees to be received by the general partner, including an interior design fee of 5% of the cost of furniture, fixtures and equipment, a fee for obtaining financing, amounting to 3% of the principal amount of financing obtained, and a development fee, equal to 6% of the total cost of the Inn.

## II.

The general partner had financed the project with a $6,000,000 issue of tax-free industrial revenue bonds. When the cost of building and equipping the Inn exceeded the initial estimates by a substantial amount, the general partner purportedly lent the partnership over $1,000,000. This created a problem for the

limited partner because of the way it affected distributions under the partnership agreement.

The agreement originally provided that each partner was to receive an annual distribution in the form of a pro rata share of cash flow. Cash flow was defined in the agreement as amounts reported as net profits (or losses) with the addition or subtraction of certain items. Net profits or losses were those figures "as finally determined for Federal Income Tax purposes under the accrual method of accounting." Items which could be subtracted from net profits to determine cash flow included repayments of loans made by the partners.

As a result of such loan repayments, the limited partner was incurring tax liabilities for the net profits, but was not receiving any distribution with which to pay its taxes. Other items permitted by the contract to be subtracted from net profits for the purpose of determining cash flow included the funding of a ninety days working capital reserve, and the creation of a discretionary reserve for capital improvement. The question of reserves did not become an issue for the parties until the loan was fully repaid.

The Rudy heirs complained that as a result of the unanticipated loan, they would not be receiving the distributions they had expected in reliance on projections prepared by GCD prior to the execution of the partnership agreement. The parties met to discuss their concerns, and negotiations continued by correspondence.

On July 13, 1988, Bob Marlowe, Treasurer of Gulf Coast Development, sent letters to the four Rudy heirs with a proposed agreement to base distributions on taxable income rather than on cash flow. The letter evidenced the earlier negotiations by characterizing the enclosed agreement as a "Revised proposed agreement

regarding future cash distribution, reflecting 75% rather than the 50% stipulated in the one sent to you in May."

The text of the agreement is reprinted below in its entirety:

## AGREEMENT

Gulf Coast Development, Inc. (GCD), General Partner of Shoney's Inn of Music Valley, Ltd. ("Shoney's"), pursuant to meetings with Frank Rudy Heirs Associates (a limited partner of Shoney's), hereby agrees to the following as to prospective cash distributions of Shoney's.

In recognition of the fact that GCD has voluntarily loaned substantial sums to Shoney's due to the cost of the project in excess of bond proceeds, GCD hereby agrees that at the end of each fiscal year, upon the determination of taxable income for Shoney's for that year, seventy-five percent (75%) of the taxable income will not be used to pay GCD's loans, but instead will be first distributed pro rata to all partners. The primary purpose of the agreement is to provide cash flow from Shoney's to the owners from which to pay the federal income tax on earnings reported to them by Shoney's on the annual IRS Form K-1.

## III.

The Inn had opened on October 23, 1987, and after some slow winter months, it achieved an average occupancy rate of over 65% for the second quarter of 1988, with significant improvements in subsequent years. Leon Moore acknowledged in his 1993 deposition that the Music Valley operation was one of the most successful of all his hotel ventures. However, according to Mr. Marlowe, the partnership did not earn any profit for the years 1987, 1988, 1989 or 1990, and the Rudy heirs did not receive any distributions for those years.

The Rudys filed suit in the Sumner County Chancery Court on December 21, 1990. They later non-suited, and refiled in the Chancery Court of Davidson County. The deposition of Mr. Marlowe was taken on April 9, 1992. Afterwards, $72,225 was distributed to the limited partner, representing its 40% share

of 75% of the taxable income for the 1991 tax year. The general partner refused to make a cash distribution for the tax years 1992 and 1993, despite total taxable earnings of well over $800,000 for those years, according to audited financial statements.

The general partner's reasoning was that the language of the 1988 agreement implied that it would expire when GCD's loan was repaid, so that after that time no obligations to the limited partner would arise directly from the existence of taxable income. Leon Moore testified in deposition that the loan to the partnership was fully repaid in 1992.

Cash flow otherwise available for purposes of distribution was purportedly applied to the funding of the ninety days working capital reserve, and to the creation of the discretionary reserve for capital improvements. However, in a 1994 deposition Mr. Marlowe testified under questioning that no reserve accounts had actually been set up.

Mr. Marlowe stoutly defended the importance of maintaining capital reserves, whether or not the funds exist in a separate account earmarked for that purpose. He further admitted, however, that he had made no effort to calculate what the future cash needs of the partnership were likely to be, and it appears from his testimony that the general partner's purpose in withholding distributions had more to do with punishing the limited partner for filing this lawsuit than with maintaining prudent future reserves. The affidavit of David Howard, a C.P.A. who examined the partnership books, indicates that on July 1, 1994, Shoney's Inn of Opryland had cash on hand of $726,730, held in a bank savings account and earning only a nominal rate of interest.

At trial, the Rudy heirs contended that the agreement of July 13, 1988, had permanently amended the limited partnership agreement, and that they were immediately entitled to their share of the 1992 and 1993 profits. Gulf Coast Development argued that the partnership agreement had reverted to its original terms.

The parties filed motions and cross motions for summary judgment on twelve issues. The trial court granted partial summary judgment to the Rudys on the question of distributions, and found that ". . . defendants have breached the Limited Partnership Agreement as amended July 13, 1988 by failing to distribute cash flow." The court ordered the general partner to make an immediate pro rata distribution to the partners of 75% of the 1992 and 1993 taxable income of the limited partnership. Finding no just reason for delay, the court declared that portion of its order to be final pursuant to Rule 54.02, T.R.C.P., thus making possible the present appeal.

## IV.

The main contention of appellants is that the chancellor erred in concluding that the partnership agreement had been permanently amended by the July 12, 1988 agreement. They argued rather that it did not modify the partnership agreement at all, but was only meant to be a temporary arrangement, and that the provisions for distributions found in the original partnership agreement were reinstated once the loan was paid off.

We note that the 1988 agreement does not explicitly say that it modifies the partnership agreement, but appellee correctly points out that it need not do so in order to effect a modification:

> "A second contract of a later date than an earlier contract containing the same subject matter with the former contract will supersede the former contract even though there is no

express agreement that the new contract shall have that effect."

*Decca Records, Inc. v. Republic Recording Company, Inc.,* 235 F.2d 360, 363 (6th Cir. 1956).

Of course to be enforceable, a modification of an existing contract requires mutuality of assent and a meeting of the minds. See *Batson v. Pleasant View Utility District,* 592 S.W.2d 578 (Tenn.App. 1979). The appellants characterized the 1988 agreement as a unilateral offer or proposal, which never rose to the level of an enforceable contract, since the Rudy heirs did not affix their signatures to it.

We believe to the contrary, however, that there can be no doubt that by their actions, the appellees accepted the offer expressed in the agreement. These actions included failure to object (as they apparently had done in relation to the earlier offer of a 50% distribution), acceptance of the benefits, and the filing of a lawsuit to enforce the agreement. Nor can there be any question that the parties achieved a meeting of the minds after a period of negotiation. Under such circumstances, the absence of the appellees' signatures does not prevent enforcement of the agreement.

An enforceable agreement also requires consideration flowing to both parties. See *American Fruit Growers, Inc. v. Hawkinson,* 21 Tenn. App. 127, 106, S.W.2d 564, 568 (Tenn. App. 1937). In this case, both parties received consideration as a result of the agreement, in the form of distributions from the partnership. Though these distributions may have somewhat slowed the repayment of their loan, the appellants were fully repaid within a few years, and received additional cash that had not been available to them under the terms of the original agreement.

**V.**

We turn now to GCD's argument that the 1988 agreement was meant to be of limited duration. The general partner insists that the reference to its loan evidences the parties' clear intention that the agreement end when the loan is repaid. We do not find any such intention expressed directly by the language of the agreement. If we examine the possibility that a termination provision is present in the agreement by implication, we find a possible alternative to the appellants' theory in the last sentence of the agreement, which would support a contrary implication that it was the parties' intention that cash distributions be made as long as Shoney's Inns continued to report earnings to the IRS.

We note that GCD itself drafted the document. It is a well-settled rule of contract construction that ambiguities in a contract are to be construed against the party drafting it. See *Dunn v. United Sierra Corp.,* 612 S.W.2d 470, 473 (Tenn. App. 1980), *Hanover Insurance v. Haney*, 221 Tenn. 148, 425 S.W.2d 590, 592 (1968). A contract is ambiguous when its meaning is uncertain, and it can be understood in more ways than one. See *Empress Health and Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190 (Tenn. 1973).

While the appellant has set forth an arguable case that the 1988 agreement was meant to be of limited duration, terminable on the repayment of the loan, our obligation to resolve any ambiguities against the drafter of the agreement compels us to accept the appellees' argument that the partnership agreement has been permanently amended. GCD had the opportunity to add an explicit termination provision to the agreement before presenting it to the appellees for their assent, but they did not do so. They should not now be permitted to acquire the benefits that would flow to them from such a provision.

**VI.**

The judgment of the trial court is affirmed.  Remand this cause to the Chancery Court of Davidson County for further proceedings consistent with this opinion.  Tax the costs on appeal to the appellants.


_____
BEN H. CANTRELL, JUDGE


CONCUR:



_____
HENRY F. TODD, PRESIDING JUDGE
MIDDLE SECTION



_____
WILLIAM C. KOCH, JR., JUDGE