# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### February 20, 2002 Session

## DON J. LONG, FOR HIMSELF AND FOR THE BENEFIT OF GENE LANGLEY FORD, INC. V. RALPH E. LANGLEY AND EDNA ELIZABETH LANGLEY

**Direct Appeal from the Chancery Court of Gibson County, Tennessee**
**No. H-3525  The Honorable George R. Ellis, Chancellor**

_____

**No. W2001-01490-COA-R3-CV - Filed April 23, 2002**
_____

This a lawsuit between the two stockholders of Gene Langley Ford, Inc., an automobile dealership. The issues involve the percentage of ownership owned by the two stockholders and whether the defendant paid himself an excessive salary for managing the business. The Chancellor held that the plaintiff owns forty-nine (49%) of the stock and the defendant owns fifty-one percent (51%). He further held that the defendant's salary was not excessive. We reverse the Chancellor's decision regarding the ownership of the stock and hold that each party owns fifty percent (50%). We affirm the Chancellor's decision that the defendant's salary was reasonable.

**Tenn.R.App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Reversed in Part and Affirmed in Part; and Remanded**

WILLIAM B. ACREE, Sp.J., delivered the opinion of the court, in which W. Frank Crawford, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Leo Bearman, Jr. and Elizabeth E. Chance, Memphis, Tennessee, for the appellant, Don J. Long.

Jesse H. Ford, III, Jackson, Tennessee, for the appellees, Ralph E. Langley and Edna Elizabeth Langley..

### OPINION

This is a lawsuit between the two stockholders of Gene Langley Ford, Inc., an automobile dealership in Humboldt, Tennessee. There are two issues presented for review. The first issue involves the percentage of ownership owned by the two shareholders. The plaintiff, Don J. Long, (Long) maintains that he owns fifty percent (50%) of the stock, whereas the defendant,

Ralph E. Langley (Langley)[1] insists that Long only owns forty-nine percent (49%). The second issue is whether the Langley paid himself an excessive salary for managing the business for the years 1992 through 2000.

The Chancellor held that Long owns forty-nine percent (49%) of the stock and that Langley's salary was not excessive. Long appeals his decision.

The relevant facts are as follows:

Long is a resident of Arkansas and owns an interest in several automobile dealerships. In 1979, Long learned that the Ford dealership in Humboldt, Tennessee was having financial difficulties and was for sale. Long believed that the dealership could become a successful operation and became interested in purchasing it. There were also tax deductions which would be beneficial to Long.

At the time, Langley was a salesperson at one of Long's dealerships. Long approached Langley about the Humboldt dealership, and they negotiated an agreement to buy it. Each party agreed to pay $40,000.00 in cash and to jointly borrow an additional $80,000.00.

On March 30, 1979, Long and Langley entered into an agreement which provided that Long would initially own all of the stock in the corporation. The purpose in transferring the stock to Long was to allow him to utilize the tax benefits resulting from the prior losses sustained by the dealership. The agreement also provided that on the first business day of January, 1980, Long would sell fifty-one percent (51%) of the stock to Langley. Finally, that agreement provided that within 30 days of the transfer of the stock, the parties would enter into a shareholder's agreement which would allow Long to purchase Langley's stock if certain conditions occurred.

On April 5, 1979, the stockholders of the seller, Cox & White Ford, Inc. transferred all 900 shares of stock in the corporation to Long. Long signed a note to Langley in the amount of $40,000.00, which represented Langley's cash contribution for the purchase of the business.

Long testified that Ford Motor Company (Ford) had a requirement that the dealer/principal in a dealership own fifty-one percent (51%) of the stock and thus have total and complete control of it. Long maintained that it had always been the intent of the parties that they would be equal owners of the business, and this was known by the Ford representative with whom they were dealing. According to Long, the purpose of the March 30, 1979 agreement was to show Ford that Langley would own fifty-one percent (51%) of the stock. Langley conceded that the parties were to share in the profits of the business on an equal basis, but contends that the

---

[1]Ralph E. Langley's wife, Edna Elizabeth Langley, is a defendant in this case. However, her only involvement was as a director of the corporation. She did not testify in the case and has no direct interest in the outcome.

March 30, 1979 agreement conferred fifty-one percent (51%) ownership of the business upon him.

The parties began operating the dealership in 1979 with Langley managing the business. Long was not involved with the day to day operations.

On May 20, 1980, the parties entered into another shareholder's agreement which recited that Long and Langley each owned 450 shares of Gene Langley Ford, Inc. The shareholder agreement included provisions which would allow either stockholder the right to acquire the other's stock under certain circumstances. Under the prior agreement, only Long had that right. On the same date, Long transferred 450 shares of stock to Langley. Three days later, Langley recorded the transfer on the corporate records.

For several years, the parties operated the dealership under the apparent impression that Langley had been approved as the dealer. However, in 1988, they learned that this was not true and renewed their efforts to designate Langley as the dealer. Long wrote Ford on August 2, 1988 informing Ford that Langley had "fifty-one percent (51%) of the voting power in Gene Langley Ford, Inc.". The record is not clear as to what additional information, if any, was submitted to Ford after August 2nd , but on August 9, 1988, Ford informed Langley that it had received the documents which would make Langley a fifty percent (50%) owner of Gene Langley Ford, Inc. However, Ford noted several deficiencies which were to be corrected before the change could be processed. By this time, Ford had changed its policy that a dealer had to own at least fifty-one percent (51%) of the dealership.

On September 25, 1989, Ford and Gene Langley Ford, Inc. entered into an amendment to the Ford Sales and Service Agreement. This amendment provided that Long and Langley each owned fifty percent (50%) of the stock. Langley signed the amendment as president of Gene Langley Ford, Inc.

On May 24, 1991, the shareholders held an annual meeting. The minutes recited that Long owned 441 shares and Langley 459. The minutes also reflected that by majority vote of the stockholders, new certificates were to issue with Long receiving 441 shares and Langley 459. Long was at the meeting and voted against reissuing stock to give Langley a majority ownership. The minutes were signed by Langley's wife.

There were other documents relevant to this issue which were introduced at the trial. There was an application for a Small Business Administration loan in 1980, which reflected that Long owned forty-nine (49%) of the stock and Langley owned fifty-one (51%). Long testified that SBA had a requirement similar to that of Ford in that the managing owner must own a majority of the stock. This was not disputed by Langley. There was also a financial statement supplement submitted to Ford in 1981 reflecting the same percentage ownership. Langley testified that at that time the parties were still attempting to obtain approval of the dealership in

3

his name.

When Long and Langley purchased the dealership in 1979, it was having serious financial difficulties. It had changed ownership on four or five occasions and only had nine employees. Langley began with a salary of $276.00 a week which remained in effect until the early 1990's.[2] It was necessary that he work extensive hours. The dealership performed very poorly throughout the 1980's, but by the early 1990's, it had become a profitable business.

In 1992, Langley began paying himself a substantially higher salary.[3] From 1992 through the year 2000, his salary averaged $173,768.00 a year.

Langley testified that Long was aware of the increase in the salary because he received monthly financial statements and the corporate tax returns. Langley said he did not know that Long had a problem with his salary until Long sued him.

This suit was filed in October of 1995. In July of 1998, Arnold, Spain, Truett and Hewitt, P.L.L.C., Certified Public Accountants, were appointed as Special Master. The Special Master issued its report on November 30, 2000, and the report covered the time period of 1992 through 1997. The case was tried in April, 2001.

Mike Hewitt, a partner in Arnold, Spain, Truett and Hewitt, P.L.L.C., testified at the trial as to the findings of the Special Master.

Mr. Hewitt testified that for the years 1992 through 1997, Langley's salary averaged $163,218.00 a year and represented 1.61% of the average annual sales of the dealership. Mr. Hewitt concluded that Langley's salary was reasonable. In reaching this conclusion, he considered data from six automobile dealerships in West Tennessee and also data from Robert Morris and Associates. The latter is a firm that compiles financial data for collectors for banks which use the data to evaluate financial statements and make credit decisions. Mr. Hewitt testified that he was not aware of any guidelines issued by Ford concerning salaries to be paid by its dealerships nor did he have any data concerning the average salaries paid to managers of Ford dealerships of comparable size to the Humboldt dealership.

The Special Master's report revealed that from 1992 through 1997, the stockholders equity increased from $520,807.00 to $1,533,172.00. One dividend had been paid and that was $40,000.00 to each shareholder.

---

[2] The record reflects that Langley received a sales commission; however, it does not reflect the amount or basis for the commission.

[3] Langley reissued himself a majority interest of the stock in May 1991. The record does not reflect whether he increased his salary immediately following the reissuance of the stock. His 1991 income is not in the record and is not an issue in this case.

Robert Davis, a certified public accountant, with George B. Jones and Company was called as an expert witness by Long. Mr. Davis was retained to offer expert opinion testimony as to the reasonableness of Langley's salary. His investigation covered the time period of 1992 through 2000. Mr. Davis evaluated the information that was provided to him in the Special Master's report, and he also utilized the database of information of the National Automobile Dealer's Association. The sample he utilized during this time frame ranged from 109 to 170 Ford dealerships of similar size in the geographic region. Mr. Davis also relied upon his own experience in the automobile industry.

Mr. Davis concluded that there was a range of overpayment to Langley from $749,517.52 to $972,751.76. In Mr. Davis' opinion, Langley should have paid himself a salary of $50,000.00 a year plus ten percent (10%) of the net profit.

Mr. Davis testified (as did Mr. Hewitt) that there are no industry standards by Ford Motor Company for salaries to its managers nor is there a compiled source of information for salaries paid to them. His opinion of a $50,000.00 year salary plus ten percent (10%) of the net profits was just his opinion. Mr. Davis also admitted that he was not aware of Langley's background or the effort he had put into the business and was unaware that only one dividend had been paid to the shareholders.

Michael Steele, a certified public accountant, testified in behalf of Langley. Mr. Steele prepared the tax returns for the dealership for a number of years. Mr. Steele did not offer an opinion as to the reasonableness of Langley's salary for the time period in question but did testify that during the early years of the business, Langley drew a very minimal salary which was well below what one in his position should earn.

The record reflects that during the years 1992 through1997, the time period covered by the Special Master's report, the dealership had average annual sales of $10,128,900.00 and Langley's average salary was $163,218.00 or 1.61% of sales. In the years 1998 through 2000, the years which were not included in the Special Master's report, the average annual sales of the dealership were $12,569,364.00, and Langley's average annual salary was $173,768.00 or 1.55% of sales.

At the conclusion of the trial, the Chancellor made the following findings:

> "The Court finds that the plaintiff has failed to carry the burden of proof that Gene Langley paid himself an excessive salary. . . The Court finds that in 1979, Don Long offered Gene Langley 51% of the Cox & White Ford, Incorporated, for $40,000.00, and to serve as manager. Gene Langley accepted this offer and has provided the agreed upon consideration. The Court, therefore, finds Gene Langley is the owner of 51% of the dealership, and Don Long is the owner of 49% of the agency."

The first issue presented for review involves the percentage of ownership owned by the two shareholders. The Chancellor found that in 1979 the parties entered into a contract whereby Langley was to receive fifty-one percent (51%) of the stock and that the parties were bound by that contract. Long contends that the Chancellor erred in failing to award each party an equal amount of the stock.

In a nonjury case, Appellate Courts review the trial court's findings of fact de novo upon the record, accompanied by a presumption of the correctness of the findings unless the evidence preponderates against the findings. Questions of law are reviewed de novo with no presumption of correctness. Tenn.R.App.P. 13 (d); Lucius v. City of Memphis, 925 S.W.2d 522, 525 (Tenn. 1996); Hawks v. City of Westmoreland, 960 S.W.2d 10, 15 (Tenn. 1997).

The Chancellor concluded as a matter of law that the March 30, 1979 agreement between the parties contractually bound them to the fifty-one percent (51%) to forty-nine (49%) percentage set forth in that agreement. Because the Chancellor reached this conclusion as a matter of law, we review this issue de novo with no presumption of correctness.

The legal question presented is whether the May 20, 1980 shareholder's agreement superceded the March 30, 1979 agreement. We observe that there are two significant differences in the two agreements. The second agreement provides for an equal ownership of stock rather than a fifty-one percent (51%) to forty-nine percent (49%) division, and it gives both Long and Langley the right to purchase the other's stock under certain circumstances. The first agreement conferred this benefit only upon Long.

The ordinary rule in contractual matters is that the last agreement as to the same subject matter which is signed by all parties supercedes all former agreements, and the last contract is the one which embodies the true agreement. Bringhurst v. Tual, 598 S.W.2d 620, 622 (Tenn. App. 1980). A modification of an existing contract requires mutuality of assent and a meeting of minds. Balderaccahi v. Ruth, 256 S.W.2d 390, 391 (Tenn. App. 1952); Batson v. Pleasant View Utility District, 592 S.W.2d 578, 582 (Tenn. App. 1979); Rudy Heirs Assoc. v. Moore & Assoc., Inc., 919 S.W.2d 609, 612 (Tenn. App. 1995). An alteration or amendment to an existing contract must be supported by consideration. Performance of what was already promised in the original contract is not consideration to support a second contract. The modification of an existing agreement which imposes new obligations on one of the parties is unenforceable for lack of consideration unless it also imposes a new obligation on the other party. Dunlop Tire and Rubber v. Service Merchandise, 667 S.W. 2d 754, 758, 759 (Tenn. App. 1983). All contracts in writing signed by the party to be bound is prima facie evidence of consideration. T.C.A. §47-50-103. Atkins v. Kirpatrick, 823 S.W.2d 547, 552 (Tenn. App. 1991). The burden of overcoming the presumption of consideration in a validly executed contract is upon the party asserting lack of consideration. Id, at 552.

6

We find that the modification of the percentage of ownership of stock in the second agreement was supported by adequate consideration.   Under the second agreement, Langley obtained the right to purchase Long's stock upon Long's death or at an agreed upon price if Long desired to sell his stock.  Under the 1979 agreement, Long had the right to purchase Langley's stock upon Langley's death or withdrawal from the business, but Langley did not have similar rights.

The evidence supports a finding that the parties intended equal ownership.  In determining the intent of the parties to a contract, the course of conduct between parties is the strongest evidence of their original intent.  Frierson v. Int'l Agric. Corp., 148 S.W.2d 27, 37 (Ct. App. 1940); Pinson & Assoc. v. Kreal, 800 S.W.2d 486, 487 (Tenn. App. 1990).

The shareholder's agreement dated May 20, 1980, unequivocally provided that each shareholder own 450 shares.  By a separate document of the same date, Long transferred 450 shares to Langley.  Three days later, Langley transferred the 450 shares of stock on the books of the corporation.

The 1980 distribution of equal shares to the parties  remained in effect and undisturbed until May of 1991 when Langley unilaterally reissued fifty-one (51%) of the stock to himself.  Thus, for 11 years, the parties maintained equal ownership.  Within that 11 year period, Langley was finally designated as a dealer by Ford Motor Company.  On September 25, 1989, Ford and Gene Langley Ford, Inc. entered into an amendment to the Ford Sales and Service Agreement to include Langley as a dealer.  More importantly, this agreement provided that Langley and Long each owned fifty percent (50%) of the business, and the agreement was signed in behalf of the corporation by Langley.  By then, Ford had changed its requirement that the dealer must own a majority of the stock.

Perhaps, the strongest evidence of the parties intent to own the business equally is Langley's admission that they were to divide the profits equally and that they paid the dividend in equal amounts.

We observe that there is some evidence during this time of a different intent.  Long represented to both Ford and to the Small Business Administration that Langley owned fifty-one percent (51%) of the stock in the corporation.  However, Long offered a logical explanation which was not disputed by Langley.  He testified that the reason for this representation was that both Ford and the Small Business Administration had requirements that the managing owner own a majority of the stock.

In summary, we find the parties intended to have an equal ownership in the dealership and that the 1980 shareholder's agreement is a valid contract between the parties which is supported by adequate consideration and which supercedes the 1979 shareholder's agreement.  Accordingly, we hold that the parties own an equal amount of shares in Gene Langley Ford, Inc.

7

The second issue presented for review is whether Langley paid himself an excessive salary for managing the business for the years 1992 through 2000. His salary for those years averaged $173,768.00 a year. This is to be contrasted with his earlier salary of $276.00 a week plus an unknown amount in sales commissions.

This issue is in somewhat of an unusual posture. The Special Master was directed to render an advisory opinion on the reasonableness of Langley's salary. However, the time period investigated by the Special Master was for the years 1992 through 1997 and does not include the years 1998 through 2000 which are also at issue in this case. This distinction is significant because of the well established rule that a concurrent finding of a Special Master and a trial court is conclusive on appeal, except where it is upon an issue not proper to be referred, where it is based on an error of law or a mixed question of fact and law, or where it is not supported by any material evidence. Manis v. Manis, 49 S.W.3d 295, 301 (Tenn. Ct. App. 2001); Long v. Long, 857 S.W.2d 825, 828 (Tenn. Ct. App. 1997); Aussenberg v. Kramer, 944 S.W.2d 367, 370 (Tenn. Ct. App. 1996); Archer v. Archer, 907 S.W.2d 412, 415 (Tenn. Ct. App. 1995).

The Special Master found that Langley's salary for the years 1992 through 1997 was reasonable. The Chancellor reached the same result by finding that Long failed to carry the burden of proof that the salary was excessive. However, Long contends that this was not a concurrent finding because the Chancellor found that the plaintiff failed to carry the burden of proof rather than finding the salary to be reasonable. We think that this is a distinction without difference. By rejecting the claim that the salary was excessive, the Chancellor implicitly found it to be reasonable. In conclusion, we hold that there was a concurrent finding of the Special Master and the Chancellor that Langley's salary for the years 1992 through 1997 was reasonable and that the concurrent finding is conclusive on appeal.

If we were not bound by the concurrent finding by the Special Master and the Chancellor, we would reach the same result. Although we do not approve of Langley's unilateral action in setting his salary nor do we understand why Long did not complain of it until he filed this suit in 1995, nevertheless, we believe that Langley was entitled to this compensation.

When these parties purchased the dealership, it was in financial difficulty and remained in that condition for several years. During this time frame, Langley worked long hours for little pay. By the early 1990's, the dealership had become profitable. From 1992 through 1997, the stockholder's equity increased by more than $1,000,000.00. Langley's salary for those years averaged $163,218.00 which represented 1.61% of the average annual sales.

Long's evidence that the compensation was excessive was not convincing. Long's expert witness, Robert Davis, utilized a rather large data base of information in his investigation, but his opinion that Langley should have paid himself a salary of $50.000.00 a year plus ten percent (10%) of the net profit was a personal opinion and was unsupported by any concrete data as to the appropriate salaries for Ford managers. Furthermore, Mr. Davis was not aware of certain circumstances peculiar to this particular dealership such as Langley's background, the effort he

had put into the business over the years, or the amount of dividends paid to the shareholders.

In summary, we find that the salary for the years 1992 through1997 was reasonable and that  Long failed to establish by a preponderance of evidence that it was not.

The Special Master's investigation did not include the years 1998 through 2000.  During those years, Langley's average annual salary was approximately $10,500.00 a year more than his average salary for 1992 through 1997.   However, the average annual sales of the dealership for 1998 through 2000 were substantially higher than in the earlier period, and  Langley's salary as a percentage of sales was less than in 1992 through1997.

The evidence does not preponderate against the Chancellor's finding that Langley's salary for the years 1998 through 2000 was reasonable.  We also conclude that the compensation was reasonable and that the plaintiff failed to establish by a preponderance of the evidence that it was not.

In summary, we hold that the parties own an equal amount of stock in Gene Langley Ford, Inc. and that Langley's compensation for the years 1992 through 2000 was reasonable and not excessive.

The judgment of the trial court is reversed in part and affirmed in part.  The case is remanded to the Chancery Court of Gibson County for proceedings consistent with this opinion. The costs are divided equally between the parties.

_____
WILLIAM B. ACREE, JR., SPECIAL JUDGE

9