IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 8, 2010

## GREENBANK, F/K/A GREENE COUNTY BANK v. BARBARA J. THOMPSON, ET AL.

**Appeal from the Circuit Court for Blount County**
No. L-16063    Jon Kerry Blackwood, Senior Judge

No. E2010-00160-COA-R3-CV - FILED DECEMBER 29, 2010

Bank provided a loan to Borrowers for the purchase of real property and construction of a log cabin home. After Borrowers defaulted on the loan, Bank sold the property at a foreclosure sale. Bank then initiated a lawsuit alleging conversion, negligent business representation, and promissory fraud. Bank also sought a deficiency judgment for the difference in the amount owed on the loan and the foreclosure sale price. After a bench trial, the trial court awarded a judgment for $61,782.12 and a deficiency judgment for $300,644.92 in favor of Bank. Borrowers appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO JR., J., joined.

C. Mark Troutman, LaFollette, Tennessee, for the appellants, Barbara J. Thompson and James L. Thompson.

Mary D. Miller, Knoxville, Tennessee, for the appellee, Greenbank F/K/A Greene County Bank.

## OPINION

### I. FACTUAL BACKGROUND

Barbara J. Thompson and James L. Thompson (collectively "the Thompsons" or "Borrowers") sought financing for the purchase of real property and construction of a log cabin. The real property was located at 4620 Miser Station Road, Friendsville, Tennessee,

and the sale price was $265,000 ("the Property").  Borrowers contacted American Fidelity Bank[1] ("the Bank") about financing their purchase.  Borrowers submitted a loan application and by signing the loan application, they agreed to: (1) disclose all debts; (2) disclose any outstanding judgments; and (3) disclose any bankruptcy filings within the past seven years.  The loan application was dated May 23, 2006.  The loan application further states:

> Each of the undersigned specifically represents to Lender and to Lender's actual and potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of the information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or criminal penalties. . . [.]

It was later discovered that Borrowers did not make all the necessary disclosures.  In fact, Borrowers had filed a bankruptcy petition in August 1999 and the Department of Justice had a judgment lien against Mr. Thompson for restitution as a result of a kiting conviction ("DOJ Lien").

Without that information at the time, the Bank proceeded with a loan in the amount of $267,997 for the purchase of the Property, and Borrowers executed a promissory note for that amount dated May 22, 2006 ("First Note").  Borrowers also executed a deed of trust against the Property, dated May 22, 2006, which was recorded in the Blount County Register of Deeds Office.  As collateral for the loan, Borrowers pledged a certificate of deposit totaling $60,000 ("the CD") and deposited the CD in the Bank.  In addition to the First Note and the deed of trust, Borrowers executed an Assignment of Deposit Account ("the Assignment") giving the Bank a security interest in the CD.

Nearly two weeks later, Borrowers executed another promissory note, dated June 2, 2006, payable to the Bank for the amount of $475,000 for financing of the Property and construction of the home ("Second Note").  As security for the Second Note, Borrowers executed another deed of trust, which was recorded in the Blount County Register of Deeds Office.  The Bank obtained a title insurance commitment and a title insurance policy in conjunction with the Second Note.  From the record, it appears that the Second Note paid off the balance of the First Note, and the remaining proceeds were released to Borrowers for the

---

[1]American Fidelity Bank was conducting business as Greene County Bank.  Eventually, Greene County Bank changed its name to GreenBank.

construction of the home. After the closing, the Bank executed a Trust Deed Release to discharge the trust deed executed along with the First Note.

Borrowers hired an unlicensed contractor to begin construction on their home. During construction, Mr. Thompson became aware of several issues with the structure and contacted the Blount County Board of Codes. After an inspection of the Property, the Board of Codes issued a stop work order. Borrowers then hired a structural engineer, who provided a report detailing serious defects with the structure. The construction on the home was never completed.

Nearly a year after obtaining the loan, the Bank and Borrowers entered into a Commercial Debt Modification Agreement ("CDMA"), dated May 1, 2007. The CDMA amended the Second Note by extending the maturity date for the loan to August 1, 2007 and changing the principal amount of the loan from $475,000 to $475,200. A renewal note, dated August 1, 2007 ("Renewal Note") extended the maturity date of the loan to November 1, 2007, which at that time, the principal would become due.

After receiving a renewal notice for the CD in August 2007, Mr. Thompson visited the Bank and withdrew the CD. Only a few months earlier, Mr. Thompson had attempted to withdraw the CD, at which time Channing Powers, Vice-President of the Bank, informed Mr. Thompson that the CD was collateral for the loan and could not be withdrawn. Soon after the withdrawal of the CD, the Bank's representatives met with Mr. Thompson and encouraged him to return the CD. After the meeting, Mr. Thompson informed the Bank that he would only re-deposit the CD if the Bank would agree to extend the loan. The Bank responded by sending demand letters to Borrowers, explaining that withdrawal of the CD placed them in default and instructing them to cure the default. Borrowers failed to re-deposit the CD or pay the principal balance on the loan when it became due.

Upon Borrower's failure to repay the loan, the Bank initiated foreclosure proceedings. During the foreclosure proceedings, the Bank discovered the DOJ Lien in the amount of $66,817.29. The title insurance policy and commitment did not mention the DOJ Lien. The Bank took the following steps regarding the foreclosure sale: (1) mailed a letter to Borrowers notifying them of the sale; (2) published a Notice of Sale in *The Daily Times*, a newspaper published in Blount County, Tennessee; and (3) obtained an appraisal of the Property. Before the sale, Borrowers's counsel contacted the Bank with an offer for the Property, which the Bank rejected. On January 6, 2009, the substitute trustee conducted a foreclosure sale of the Property and two individuals offered bids. The Property was sold to third-party purchasers for $225,000.

After the foreclosure sale, the Bank initiated a lawsuit for a deficiency judgment and

an award for the amount of the CD under the tort theories of conversion, negligent misrepresentation, and promissory fraud. Borrowers filed an answer and a counterclaim for injunctive relief. A bench trial occurred on November 12, 2009. After hearing the testimony and viewing the evidence, the trial court held that the withdrawal of the CD constituted conversion, negligent misrepresentation, and fraud and awarded a judgment for $61,728.12. The trial court also held that the Bank was entitled to a deficiency judgment in the amount of $300,644.92. Borrowers filed a timely appeal.

## II. ISSUES

Borrowers raise the following issues for review, which we restate:

A. Whether the trial court erred in holding that withdrawal of the CD constituted conversion, negligent misrepresentation, and promissory fraud.

B. Whether the trial court erred in awarding a deficiency judgment to the Bank.

## III. STANDARD OF REVIEW

We accord a presumption of correctness to the factual findings of a trial court sitting without a jury on appeal. Those findings will not be overturned unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d). With respect to legal issues, this court's review is conducted under a pure de novo standard of review. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). This court affords "considerable deference to the trial court's factual findings, especially where issues of credibility and weight of testimony are involved." *Bryant v. Baptist Health Sys. Home Care*, 213 S.W.3d 743, 750 (Tenn. 2006).

## IV. DISCUSSION

### A.

The trial court held that Borrowers' withdrawal of the CD constituted conversion, negligent misrepresentation, and fraud. Borrowers contend that the trial court erred in its finding.

Borrowers offer numerous arguments challenging the trial court's finding that they committed conversion. First, they contend that there is no evidence demonstrating that the

CD was collateral for the second loan. Second, Borrowers further argue that the elements of conversion cannot be met because the Bank's representative released the CD to Mr. Thompson. Third, Borrowers assert that the Bank failed to file a financing statement documenting its security interest in the CD. Borrowers essentially argue that if the Bank had any security interest in the CD, the security interest was perfected by the Bank's possession of the CD and the Bank lost its security interest after the withdrawal of the CD. We disagree.

Conversion is "the appropriation of the thing to the party's own use and benefit, by the exercise of dominion over it, in defiance of plaintiff's right." *See Paehler v. Union Planters Nat'l Bank*, 971 S.W.2d 393, 398 (Tenn. Ct. App. 1997) (quoting *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977)). Conversion is an intentional tort. To prove conversion, a plaintiff must show the following: (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights. *H & M Enterprises, Inc. v. Murray*, No. M1999-02073-COA-R3-CV, 2002 WL 598556, at *3 (Tenn. Ct. App. M.S., Apr. 17, 2002) (citing *Kinnard v. Shoney's, Inc.*, 100 F.Supp.2d 781, 797 (M.D. Tenn. 2000)).

In this case, the trial court found that Borrowers had knowledge that the CD was collateral for the Second Note. Specifically, the trial court held:

> In the present case, the plain language of the loan documents and the meeting between Mr. Powers and Mr. Thompson at the Bank gave the Defendants actual notice that the CD was part of the Bank's collateral for the Loan. It is clear from both the Note and the Assignment that the Bank still held the CD as collateral and that it had not been released.

The First Note and the Renewal Note include the same provisions regarding collateral for the loan. For instance, in the Renewal Note, it describes the property that constitutes collateral for the loan and states, in part:

> I [Borrowers] give you [the Bank] a security interest in all of the Property described below that I own or have sufficient rights in which to transfer an interest, now or in the future, wherever the Property is located or will be located, and all proceeds and products of the Property. "Property" includes all parts, accessories, repairs, replacements, improvements, and accessories to the Property, and all obligations that support the payment or performance of the Property. "Proceeds" include anything acquired upon the sale, lease, license, exchange, or other disposition of the Property; any rights and claims arising from the Property; and any collections and distributions on account of the

Property.

* * *

**Deposit Accounts:**   All deposit accounts including, but not limited to, demand, time, savings, passbook, and similar accounts.

The First Note and the Renewal Note outline various types of property, a description of each type of property, and a box to mark if that particular class of property is to be included as collateral for the loan. There is an "x" appearing in the box for "Deposit Accounts." Further, the Assignment provides the Bank with a security interest in the CD. The Assignment states, in pertinent part:

Assignment of deposit or share account:   For value received, I assign and transfer to you, and I give you a security interest in the following account(s):

AFB Savings #7745656 in the amount of $60,156.55

and any renewals or substitutions.   Theses account(s) will be referred to as the collateral in the rest of this agreement.   The collateral is held with:

American Fidelity Bank
Greene County Bank Office Greenevil[lle]
PO Box 369
Alcoa, TN 37701

which will be referred to as the depository in the rest of this agreement.   The collateral includes all funds now in the accounts listed plus all additions of any kind and from any source, made at listed plus all additions of any kind and from any source, made at anytime before the release of this agreement in writing.

Secured Debt(s): This agreement is made to secure the payment of:
all present and future debts, of every kind and description which:

James L. Thompson
Barbara J. Thompson. . .[.]

The interpretation of written agreements is a matter of law, which this court reviews de novo without a presumption of correctness. *See Guiliano v. Cleo, Inc.*, 995 S.W.2d 88,

95 (Tenn. 1999). The cardinal rule of contract interpretation is that the court must attempt to ascertain and give effect to the intention of the parties. *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005). In attempting to ascertain the intent of the parties, the court must examine the language of the contract, giving each word its usual, natural, and ordinary meaning. *See Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996). The court's initial task in construing the contract is to determine whether the language is ambiguous. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002). A contract is ambiguous if its meaning is uncertain and is susceptible to more than one reasonable interpretation. *See Bonastia v. Berman Bros.*, 914 F.Supp. 1533, 1537 (W.D. Tenn. 1995); *Frank Rudy Heirs Assocs. v. Moore & Assocs., Inc.*, 919 S.W.2d 609, 613 (Tenn. Ct. App. 1995); *Gredig v. Tennessee Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994).

In the instant case, the language in the Note and the Assignment is unambiguous, and the language used in both documents clearly gives the Bank a security interest in the CD. At trial, Mr. Powers testified that the Bank extended the loan on two separate occasions based on Borrowers' representations that the CD would remain deposited in the Bank. He further explained that the Bank relied on the CD as collateral for the loan. Mr. Powers testified that the first time Mr. Thompson attempted to withdraw the CD, he explained to Mr. Thompson that withdrawal of the CD "was not acceptable, that that was collateral for our loan." In Mr. Thompson's trial testimony, he corroborates that this meeting occurred. However, after receiving a renewal notice for the CD from the Bank in August 2007, Mr. Thompson testified that he then believed that it was acceptable to withdraw the CD. The renewal notice, dated August 13, 2007, states in pertinent part:

> Your Time Certificate #7745656 with a balance of 61,470.31 will renew on 8/22/07 with a new maturity date of 3/22/08. If you want to make any changes to this certificate, it must be done within 10 days after the renewal date.

Despite Mr. Thompson's subjective beliefs concerning the meaning of the renewal notice, the Assignment outlines that the Bank will hold the CD as collateral until it releases its security interest in writing. The Assignment states:

> This agreement will last until you [the Bank] release it in writing and you are not required to release it until the secured debts are paid in full.

In light of the Notes, the Assignment, and the meeting between Mr. Powers and Mr. Thompson, we agree with the trial court and find that Borrowers had knowledge that the CD was collateral for the loan. We also find that Borrowers' contentions are not meritorious; Borrowers' contentions fail to address the elements of conversion. By withdrawing the CD

with knowledge that it was security for the loans and contrary to the Bank's rights, Borrowers committed conversion. The Bank has sustained its burden in establishing the elements of conversion. The trial court correctly awarded $61,782.92 to the Bank, representing the total amount of the CD. Accordingly, we affirm.

Having decided that the Bank is entitled to a judgment for the total amount of the CD, our holding pertermits the necessity for further discussion of whether the Bank is entitled to the same judgment under the theories of negligent business representation and promissory fraud.

B.

Borrowers next take issue with the trial court's award of a deficiency judgment to the Bank. They assert that irregularities and unfairness existed in the foreclosure sale of the Property. Specifically, Borrowers argue that: (1) the Bank failed to file a title claim regarding the DOJ Lien and failed to make adequate disclosures about the DOJ Lien to bidders at the foreclosure sale; (2) the foreclosure sale was conducted during the winter when the level of Fort Loudon Lake was low, failing to showcase the Property as a lake front property; and (3) the Bank sold the Property for far less than the fair market value.

In *Holt v. Citizens Central Bank*, 688 S.W.2d 414, 416 (Tenn. 1984), the Tennessee Supreme Court announced the rule for foreclosure sales by stating:

> If a foreclosure sale is legally held, conducted and consummated, there must be some evidence of irregularity, misconduct, fraud, or unfairness on the part of the trustee or mortgagee that caused or contributed to an inadequate price for a court of equity to set aside the sale.

*Id.*; *see also Lost Mountain Dev. Co. v. King*, No. M2004-02663-COA-R3-CV, 2006 WL 3740791, at *6 (Tenn. App. Ct. M.S., Dec. 19, 2006). Nonetheless, the applicable rules to this case concern deficiency judgments as set out in *Duke v. Daniels*, 660 S.W.2d 793 (Tenn. Ct. App. 1983). The principles on deficiency judgments after a foreclosure sale of real property are: (1) the value of the property sold is not looked into in a deficiency case unless there is a claim of fraud in the manner of the sale or that the sale price was grossly inadequate; (2) there is a presumption that the sale price of the property at the public sale is the fair market price of the property in the absence of an allegation of irregularity in the sale; (3) when gross inadequacy is claimed, the burden of overcoming the presumption that the public sale was free of irregularity is on the defendant against whom a deficiency judgment is sought. *Id.* at 795.

Therefore, when a debtor challenges the adequacy of the foreclosure sale price as a defense to an action to collect the difference between the amount owed and the foreclosure proceeds, a court must consider "the value of the real estate at the time of the foreclosure." *Lost Mountain Dev. Co.*, 2006 WL 3740791, at *5 (quoting *Duke*, 660 S.W.2d at 794.). The value of the property prior or subsequent to the foreclosure sale is not relevant. *Id.* at *5 (quoting *Brown v. Eckhardt*, 129 S.W.2d 1122, 1128 (Tenn. Ct. App. 1939)). Unless there is evidence demonstrating irregularity, misconduct, fraud, or unfairness during the foreclosure sale, "Tennessee law accords conclusive effect to the price produced through the foreclosure sale, '[e]ven where the sale price is shockingly disproportionate to the actual value of the Property.'" *Citizens Nat'l Bank v. Mountain Ridge, LLC*, No. 3:09-CV-263, 2010 WL 4238479, at *4 (E.D. Tenn. Oct. 21, 2010) (citations omitted). Nevertheless, a debtor may offer evidence about the fair market value of the property at the time of the sale "so as to attempt to overcome the presumption and prove that the sale price was grossly inadequate." *Lost Mountain Dev. Co.*, 2006 WL 3740791, at *5

In the case at bar, we reject Borrowers' contentions that the DOJ lien and the sale occurring during the winter created irregularities in the foreclosure sale. Borrowers offer no evidentiary or legal support for either argument, and they concede that the Bank provided bidders notice of the DOJ lien and sold the Property subject to the DOJ lien. Without more, we do not find that there were any irregularities during the foreclosure sale.

Turning to Borrowers' argument concerning the fair market value of the Property, we also find that this argument fails. Borrowers assert that the foreclosure sale price of $225,000 was far below the Property's fair market value of $275,000. They argue that the appraisal ignored the money invested in building the home and the future value of the Property after the completion of the home. Robert Burke, a licensed Real Estate Appraiser, testified at trial. Mr. Burke prepared an appraisal for the Property on behalf of the Bank. After conducting the appraisal, Mr. Burke summarized his findings in the Residential Appraisal Report ("Appraisal Report."), which became effective on December 20, 2008. The Appraisal Report provided $275,000 as the market value and $220,000 as the liquidation value for the Property. Mr. Burke also testified that he did not give any value to the improvements on the Property because the home was "open to the elements" and "due to the structural engineer's report that with the structural problems that he reported I could give no value to the improvements." As stated earlier, the relevant question when inquiring into the fair market value of a property is the value of the property at the time of the foreclosure sale. *Lost Mountain Dev. Co.*, 2006 WL 3740791, at *5. Borrowers have not offered any evidence demonstrating that there were any irregularities or problems at the time of the sale. Further, Borrowers failed to provide any proof, aside from Mr. Thompson's speculative testimony, to overcome the presumption that the sale price was adequate and represented a fair market

value.  Thus, we hold that the trial court properly awarded a deficiency judgment in favor of the Bank.  We affirm.

## V.  CONCLUSION

The judgment of the trial court is affirmed.  Costs of this appeal are taxed to the appellants, Barbara J. Thompson and James L. Thompson.  This case is remanded, pursuant to applicable law, for the collection of costs assessed below.

_____

JOHN W. McCLARTY, JUDGE