FILED
06/28/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 19, 2018 Session

### SHAWN L. KECK ET AL. v. E.G. MEEK, SR., ET AL.

**Appeal from the Chancery Court for Union County**
**No. 6846      Elizabeth C. Asbury,  Chancellor**

### No. E2017-01465-COA-R3-CV

This case involves a contract dispute concerning four simultaneously executed agreements that, if completed, would have essentially constituted a trade of two parcels of improved real property.  The plaintiff buyers entered into the four agreements with the defendant sellers on October 1, 2013, giving the buyers a lease on the sellers' property, located on Walnut Breeze Lane in Knoxville, Tennessee (the "Walnut Breeze Property"), with an option to purchase that property in the unspecified future.  The buyers agreed to trade equity in their own property, located on First Street in Corryton, Tennessee ("First Street Property"), as partial payment for the Walnut Breeze Property if they chose to exercise the option.  On January 6, 2014, the parties met for a "closing," and the buyers conveyed title to the First Street Property to the sellers.  However, the "REAL ESTATE SALES CONTRACT" related to the Walnut Breeze Property stipulated that the transfer of title to the Walnut Breeze Property was subject to the existing mortgagee's approval, which neither party had obtained.  The buyers continued to reside at the Walnut Breeze Property, making monthly payments to the sellers until a year later when the buyers vacated the Walnut Breeze Property and stopped making payments.  The sellers sent the buyers a notice to vacate three months later.  In November 2016, the buyers filed a complaint in the Union County Chancery Court ("trial court"), claiming breach of contract, unjust enrichment, and fraud.  The buyers requested $75,000 in compensatory damages, $150,000 in punitive damages, return of the First Street Property, and reasonable attorney's fees.  The sellers filed an answer and subsequent amended answer, denying all substantive allegations and raising affirmative defenses.  The sellers concomitantly filed a counterclaim, asserting, *inter alia*, that the buyers had breached the lease agreement and requesting an award of unpaid rent and reasonable attorney's fees.  Following a bench trial, the trial court found that the buyers breached the terms of the lease agreement by withholding payments on the Walnut Breeze Property for three months.  The trial court also found that the buyers had exercised their option to purchase the Walnut Breeze Property by signing over title to the First Street Property but that the sellers knew at that time that the buyers could not satisfy the financing condition of the sale.  The trial court awarded to the buyers the equity value of the First Street Property as

stipulated in the sales agreement concerning that property, minus the value of three months' unpaid rent, which the trial court awarded to the sellers. The trial court denied the parties' respective requests for attorney's fees. The sellers have appealed. Having determined that each party is entitled to some award of attorney's fees under the overarching contract, we reverse the trial court's denial of attorney's fees and remand for a determination of the respective attorney's fee awards. We affirm the trial court's judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and JOHN W. MCCLARTY, JJ., joined.

Lewis S. Howard, Jr., and Erin J. Wallen, Knoxville, Tennessee, for the appellants, E.G. Meek, Sr., and Shirley T. Meek.

Danny C. Garland, II, Knoxville, Tennessee, for the appellees, Shawn L. Keck and Marcella H. Keck.

**OPINION**

I. Factual and Procedural Background

The facts underlying the execution of the four agreements at issue are essentially undisputed. At the time that the plaintiffs, Shawn L. Keck and Marcella H. Keck (collectively, "the Kecks"), entered into the agreements with the defendants, E.G. Meek, Sr., and Shirley T. Meek (collectively, "the Meeks"), the Kecks held title to the First Street Property with a corresponding mortgage balance of approximately $14,700 owed to Superior Finance. Having known Mr. Meek for some time prior to the instant transaction, the Kecks sought out Mr. Meek in the fall of 2013 for the purpose of selling their First Street Property. The Kecks also wished to purchase a new home through Mr. Meek, who was a licensed real estate agent and owner of GM Properties & Auction Company, but the Kecks' credit history posed a problem with any purchase.

To facilitate a purchase, Mr. Meek suggested utilizing the Walnut Breeze Property in conveying to the Kecks a lease with an option to buy. On October 1, 2013, the Kecks and Mr. Meek simultaneously executed four documents.[1] Mr. Meek drafted the

---

[1] Shirley T. Meek, the second named co-defendant, executed one of these documents related to the sale of the Walnut Breeze Property, the "REAL ESTATE SALES CONTRACT." Ms. Meek held joint title with Mr. Meek to the Walnut Breeze Property. Mr. Meek signed all other contract documents, including the

documents, which appear to have been originally in "boilerplate" format with handwritten changes and additions.

The first document, entitled, "Tennessee Residential Lease Agreement" ("Lease Agreement"), conveys a one-year lease of the Walnut Breeze Property to the Kecks. The rent amount is established at $544 due every two weeks, with expiration of the Lease Agreement set for October 1, 2014. The Lease Agreement further provides the following in pertinent part:

5.      **CONDITIONS OF PREMISES.** Tenant stipulates, represents and warrants that Tenant has examined the Premises, and that they are at the time of this Lease in good order, repair, and in a safe, clean and tenantable condition.

\* \* \*

11.     **MAINTENANCE AND REPAIR; RULES.** Tenant will, at its sole expense, keep and maintain the Premises and appurtenances in good and sanitary condition and repair during the term of this Agreement and any renewal thereof. . . .

\* \* \*

15.     **TENANT'S HOLD OVER.** If Tenant remains in possession of the Premises with the consent of Landlord after the natural expiration of this Agreement, a new tenancy from month-to-month shall be created between Landlord and Tenant which shall be subject to all of the terms and conditions hereof except that rent shall then be due and owing at Contract Pending/Closing on Later Date . . . and except that such tenancy shall be terminable upon fifteen (15) days written notice served by either party.

\* \* \*

20.     **DEFAULT.** . . . If Tenant fails to pay rent when due and the default continues for seven (7) days thereafter, Landlord may, at Landlord's option, declare the entire balance of rent payable hereunder to be immediately due and payable and may exercise any and all rights

---

"ADDENDUM NO. 1 TO THE REAL ESTATE SALES CONTRACT," without Ms. Meek as a co-signatory. Ms. Meek had no other personal involvement in the facts of the case and was not present during trial.

and remedies available to Landlord at law or in equity or may immediately terminate this Agreement.

21. **LATE CHARGE.**  In the event that any payment required to be paid by Tenant hereunder is not made within 7 days of when due, Tenant shall pay to Landlord, in addition to such payment or other charges due hereunder, a "late fee" in the amount of Fifty-Four and 40 Dollars ($54.40).

22. **ABANDONMENT.**  If at any time during the term of this Agreement Tenant abandons the Premises or any part thereof, Landlord may, at Landlord's option, obtain possession of the Premises in the manner provided by law, and without becoming liable to Tenant for damages or for any payment of any kind whatever. . . .

23. **ATTORNEYS' FEES.**  Should it become necessary for Landlord to employ an attorney to enforce any of the conditions or covenants hereof, including the collection of rentals or gaining possession of the Premises, Tenant agrees to pay all expenses so incurred, including a reasonable attorneys' fee.

* * *

31. **MODIFICATION.**  The parties hereby agree that this document contains the entire agreement between the parties and this Agreement shall not be modified, changed, altered or amended in any way except through a written amendment signed by all of the parties hereto.

* * *

33. **ADDITIONAL PROVISIONS; DISCLOSURES.**
This lease is made w/ Contract for a closing date to be agreed upon by the parties.  Contract governing this agreement has been executed and conditions of such shall govern closing date.

The second agreement, entitled, "REAL ESTATE SALES CONTRACT" ("Real Estate Contract"), provides for the sale of the Walnut Breeze Property from the Meeks to the Kecks for a purchase price of $130,000.  The Real Estate Contract includes the following pertinent provisions:

PRICE AND TERMS

3. Buyer(s) [the Kecks] agree to pay One Hundred & Thirty Thousand dollars ($130,000.00) for this property in the following manner:

Financed with an Owner Financed Through Contract for deed at time lease option purchase is exercised. Closing date not determined @ time of contract, but to be done ASAP – Subject to transfer meeting the approval of Home Federal Bank. An affidavit, if required, and recorded in Register's Office Knox Co. TN. if such seem necessary for the notice of intentions are required to be public record.

EARNEST MONEY DEPOSIT

4. Buyer(s) [the Kecks] has given to [the Meeks], hereinafter called Agent, Thirty Thousand and see Addendum for additional (30,000.00), House Trade Allowance and less balance to Superior finance for house & lot . . . as an earnest money deposit to be credited against the payment of the purchase price, and as a guarantee of specific performance.

* * *

MORTGAGE

12. The purchase price or contract price is to be fully paid in cash, when and if the mortgage loan referred to herein is approved and closed. If this loan is not approved for the amount applied for, this contract can be cancelled by the Buyer(s) [the Kecks] and the earnest money will be returned. The Buyer(s) agrees to immediately apply for the necessary mortgage loan to conclude this contract and will furnish all necessary

5

information or documents as required for the approval of this loan. The Buyer(s) agrees to execute mortgage documents when the loan is ready to close and the terms of this contract have been carried out.

\* \* \*

CONTRACT PERFORMANCE  14. Time is of the essence of this contract. Should the Buyer(s) [the Kecks] fail to perform the covenants herein contained within the time specified, Seller(s) [the Meeks] shall have the right to pursue any and all remedies available to Seller(s) at law or in equity, including, without limitation, requiring specific performance on the part of Buyer(s), and retaining as liquidated damages all sums which have theretofore been paid to the Seller(s) or the Agent by the Buyer(s).

If the Seller(s) defaults in the performance of this contract, Buyer(s) may reclaim the earnest money deposit and pursue any and all remedies available at law.

In the event legal action is instituted by the Agent, or any party to this contract, to enforce the terms of this contract or arising out of the execution of this contract or the sale, or to collect commissions, the prevailing party shall be entitled to receive from the other party all costs of enforcing this agreement, including a reasonable attorney fee.

\* \* \*

6

CONDITION OF PROPERTY    18.    Buyer(s) agree to accept this property in its "AS IS" condition under the terms of this paragraph unless otherwise specified. . . .

The third agreement, entitled, "ADDENDUM NO. 1 TO REAL ESTATE PURCHASE CONTRACT" ("Addendum"), incorporates an additional term into the Real Estate Contract.[2]  The Addendum provides in handwritten language:

A lease option contract which shall be considered a prelimanary [sic] contract as part of this sales contract for the purpose of buyer receiving principle [sic] credit on all payments made under the lease/option contract as if the Contract to purchase had been completed and ammortization [sic] had been based upon approx. a 20yr Ammt.

The fourth agreement, entitled, "SALE CONTRACT" ("Sale Contract"), provides for the sale of the First Street Property from the Kecks to the Meeks through the following provisions in relevant part:

In consideration of $Exchange* paid by Second Party [Mr. Meek] as earnest money and part of the purchase price, receipt of which is hereby acknowledged, this contract is made binding on both parties.  When First Party [the Kecks] shall offer or deliver to Second Party deed free and clear of all encumbrances, except as stated herein, being *Buyers due credit on above property for the net amount of equity as credit on the purchase price of the property @ Walnut Breeze in the following manner:  $30,000.00 less balance owing to Superior Finance – Knox, TN Apprx Amt. $14,700.00 which will be assumed by second party[.]

* * *

If Second Party [Mr. Meek] fails to carry out and perform the terms of this agreement within fifteen days after deed is presented, except for some good

---

[2] The Addendum explicitly modifies a "REAL ESTATE PURCHASE CONTRACT," but none of the four agreements in controversy are specifically entitled, "REAL ESTATE PURCHASE CONTRACT." The Real Estate Contract refers to an Addendum in section four and in section ten states that "1" addendum is applicable.  Additionally, the parties during trial considered the Addendum as an extension of the Real Estate Contract.  We thereby interpret the distinction between "Purchase" and "Sale" to be a mistake in drafting the agreements, and as such determine that the Addendum modifies the Real Estate Contract.

reason satisfactory and acceptable to First Party [the Kecks], he shall forfeit the above amount advanced as earnest money and part of purchase price and be held liable for complete fulfillment of the within agreement.

(Underlined language handwritten in space provided on form.)

Upon execution of the contracts, the Kecks took possession of the Walnut Breeze Property on October 1, 2013, and began making payments pursuant to the Lease Agreement. Mr. Meek testified that at some point prior to January 6, 2014, he contacted the Kecks, informing them that they had ninety days "to come in and close . . . otherwise [he and the Kecks] didn't have a deal." On January 6, 2014, the Kecks met with Mr. Meek and executed a warranty deed conveying title for the First Street Property to the Meeks for "Ten Dollars & other valuable Considerations." Mr. Meek did not convey title to the Walnut Breeze Property to the Kecks at this time. Mr. and Ms. Keck each respectively testified during trial that they left the meeting with the understanding that Mr. Meek would make the appropriate arrangements to transfer title to the Walnut Breeze Property by deed within a week. Mr. Meek testified that he knew on January 6, 2014, that officials at Home Federal Bank, the mortgagee for the Walnut Breeze Property, would not approve the transfer of title to the Walnut Breeze Property or permit assumption of the mortgage by the Kecks at that time.

It is undisputed that following this conveyance, the Meeks began making payments on the approximately $14,700 balance remaining on the First Street Property mortgage with Superior Finance, as well as purportedly paying some back taxes owed on the property.[3] This occurred while the Kecks remained as mortgagors on the debt. The Kecks continued residing on the Walnut Breeze Property for the remainder of 2014, making payments under the Lease Agreement. In January 2015, the Kecks stopped making payments and vacated the Walnut Breeze Property. The Meeks recorded the general warranty deed for the First Street Property on April 20, 2015. Two days later, Mr. Meek sent the Kecks a notice to vacate the Walnut Breeze Property by certified mail, additionally demanding payment for three months of missed payments under the Lease Agreement.

On November 16, 2016, the Kecks filed a complaint against the Meeks, alleging fraud, unjust enrichment, and breach of contract. The Kecks asserted, *inter alia*, that they had not received the deed for the Walnut Breeze Property as they had expected as part of their bargain, that Mr. Meek had failed to make necessary repairs to the Walnut Breeze Property, and that they had lost their interest in both the property they conveyed and the

---

[3] Mr. Meek testified that Superior Finance held a trust deed to the First Street Property, but it is unclear as to whether Superior Finance's permission was requested or required for a transfer of title to the property. The parties have not raised this issue on appeal.

property they purchased. The Kecks sought $75,000 in compensatory damages, $150,000 in punitive damages, a return of title to the First Street Property, and reasonable attorney's fees. The Kecks also moved for a lien *lis pendens* to be recorded concerning the First Street Property. The Kecks subsequently filed a motion for default judgment on January 18, 2017.

The Meeks, initially proceeding without benefit of counsel, filed an answer on January 23, 2017, denying all substantive allegations. Subsequently represented by counsel, the Meeks filed a motion to amend their answer on April 6, 2017, raising as affirmative defenses a failure to plead fraud with particularity, waiver, estoppel, laches, unclean hands, and the statute of frauds. The Meeks concomitantly filed a counterclaim, alleging that the Kecks had breached the contract by failing to pay rent in February, March, and April 2015 pursuant to the Lease Agreement. As damages, the Meeks sought three months' rent and late charges in the amount of $3,426, prejudgment interest, and reasonable attorney's fees. In response, the Kecks filed an answer to the counterclaim, denying liability for the missed payments and asserting that payments pursuant to the Lease Agreement were financing payments under the Real Estate Contract and not to be treated as rent.

The trial court conducted a bench trial on May 10, 2017, during which the court heard testimony from Mr. Keck, Ms. Keck, the Kecks' adult daughter, and Mr. Meek. The Kecks each stated that although they had read the four documents at issue when they signed them, their understanding of the entire transaction was based in part on Mr. Meek's explanations. The Kecks acknowledged that they were aware that Mr. Meek was applying their payments under the Lease Agreement directly toward payment of the Walnut Breeze Property mortgage. The Kecks also each testified that on January 6, 2014, they met with Mr. Meek to exchange deeds to the properties and expected Mr. Meek to convey title to the Walnut Breeze Property to them that day. According to the Kecks, Mr. Meek orally promised during the meeting to make arrangements with Home Federal Bank to transfer the Walnut Breeze Property by deed within a week. The Kecks' daughter testified that she had observed Mr. Meek visit the Kecks on at least two other occasions in 2014 and heard Mr. Meek orally promise that he would go to Home Federal Bank with the Kecks whenever he had the time.

Mr. Meek testified that his understanding of the four agreements was that the four in combination constituted a contract for a deed with a lease option to finance the payments on the Walnut Breeze Property. Contrary to the Kecks' assertions, Mr. Meek stated that his understanding of the First Street Property conveyance on January 6, 2014, was that it merely "consummated" the deal and was not an exercise of any lease option purchase. Mr. Meek maintained that he had merely told the Kecks during the January 2014 meeting that he would visit his contact at Home Federal Bank with them in order to

inform the lender that the monthly payments on the Walnut Breeze Property should be applied to the Kecks' credit rating as payments on the underlying mortgage.

Upon cross-examination, Mr. Meek acknowledged that the Kecks would possess equity in the Walnut Breeze Property under the contract, amounting to $15,300 from the First Street Property conveyance, plus the amount of any payments made pursuant to the Lease Agreement. Consequently, the Kecks would owe Mr. Meek approximately $114,000 for the remainder of the property. Mr. Meek also confirmed that the Kecks had possession of the Walnut Breeze Property through the lease in effect "until they came in and finished the paperwork and signed over their piece of property[.]" Mr. Meek acknowledged that to the best of his knowledge, officials at Home Federal Bank would not have allowed him to transfer title to the Walnut Breeze Property by deed or permit assumption of the mortgage by the Kecks during the time in which they occupied the Walnut Breeze Property. Mr. Meek admitted, however, that he had not spoken with an official from Home Federal Bank concerning the Walnut Breeze Property sale after executing the four documents in question.

In an order entered June 21, 2017, the trial court granted the Meeks' motion to amend their answer, released the lien *lis pendens* recorded against the First Street Property by the Kecks, and awarded a judgment in the amount of $11,874 in favor of the Kecks. Dismissing all remaining claims, the court incorporated its memorandum opinion, in which it had, *inter alia*, directed that the Kecks and the Meeks would each respectively pay their own attorney's fees.

The trial court specifically found that the Kecks were tenants of the Walnut Breeze Property under the terms of the Lease Agreement only until the sale of the Walnut Breeze Property but that the parties "never really got to that point." However, the court determined that the Kecks had exercised their option to purchase the Walnut Breeze Property on January 6, 2014. The court also found that the Meeks' transfer of title to the Walnut Breeze Property to the Kecks was subject to the approval of Home Federal Bank. The court further found that although neither party had sought Home Federal Bank's approval, Mr. Meek had entered into the contract on October 1, 2013, with full knowledge that Home Federal Bank would not approve the transfer.

Without expressly determining the Meeks to be in breach of contract, the trial court awarded to the Kecks $15,300, constituting the amount of equity the Kecks held in the First Street Property at the time of their conveyance of that property to the Meeks. The trial court further found the Kecks to have breached the Lease Agreement by abandoning the Walnut Breeze Property and withholding payments for three months. The trial court thereby awarded to the Meeks $3,426, the amount of past due rent and stipulated late fee. The court subtracted this amount from the award in favor of the

10

Kecks for a final judgment in the amount of $11,874 in favor of the Kecks. The Meeks timely appealed.

## II. Issues Presented

The Meeks present two issues on appeal, which we have restated as follows:

1. Whether the trial court erred by awarding to the Kecks $15,300 as equity in the First Street Property, which was allegedly applicable solely toward purchase of the Walnut Breeze Property upon the condition of the Kecks' fulfilling the lease requirements concerning the Walnut Breeze Property.

2. Whether the trial court erred by declining to award reasonable attorney's fees to the Meeks pursuant to the Lease Agreement.

## III. Standard of Review

Our review of the trial court's judgment following a non-jury trial is *de novo* upon the record, with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

We review the trial court's conclusions of law, including its interpretation of a written agreement, *de novo* with no presumption of correctness. *See Ray Bell Constr. Co., Inc. v. State, Tenn. Dep't of Transp.*, 356 S.W.3d 384, 386 (Tenn. 2011); *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009); *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013). As this Court has previously explained:

> In resolving a dispute concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contract language. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889-90 (Tenn. 2002)

(citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). A determination of the intention of the parties "is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Planters Gin Co.*, 78 S.W.3d at 890 (citing 5 Joseph M. Perillo, *Corbin on Contracts*, § 24.30 (rev. ed. 1998); *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)). The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Planters Gin Co.*, 78 S.W.3d at 890. The parties' intent is presumed to be that specifically expressed in the body of the contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Id.* (quoting 17 Am. Jur. 2d, Contracts, § 245).

*Kafozi v. Windward Cove, LLC*, 184 S.W.3d 693, 698 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. Jan. 30, 2006).

## IV. Award of Equity

The Meeks contend that the trial court erred by awarding to the Kecks $15,300 in equity when the trial court found that the Kecks had breached the terms of the Lease Agreement but did not explicitly find the Meeks in breach of contract. As the trial court stated in its memorandum opinion:

It's undisputed that in 2015 the plaintiffs vacated Walnut Breeze, and they left owing three months' rent. So I'm trying to balance equities and be as fair with everybody as I know how to be, so I think it's pretty clear that [the Kecks are] in breach of the lease agreement, and [the Meeks are] entitled to a judgment of three months' rent of $3,426.

* * *

Now, as for the bigger issue, this contract was drawn by Mr. Meek. These contracts are confusing, to say the least. On the date that the contracts were entered, October 1, 2013, Mr. Meek knew that the plaintiffs could not obtain financing to purchase the property. And also he testified that he knew that Home Federal Bank would not approve the transfer, at least at the time the contracts were made.

12

So what I think is the fair and right thing to do is to enter a judgment against [the Meeks] and in [the Kecks'] favor for $15,300. That's the equity that they had at the time of the . . . January 6th transfer of the First Street Property to him.

And when you balance those two judgments against each other, [the Meeks] will have a judgment against [them] for $11,874 in favor of [the Kecks].

The Meeks argue that the Kecks committed the first material breach of the parties' overarching contract and therefore should not have been awarded a judgment. *See Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 812 (Tenn. Ct. App. 2009) ("[A] party who commits the first material breach of contract may not recover damages for the other party's material breach."). The Meeks also specifically argue on appeal that "the Trial Court incorrectly rewrote the parties' contracts to obtain a result it believed was the 'fair and right thing to do.'"

In contrast, the Kecks contend that the trial court's ruling was proper because the Meeks failed to convey title to the Walnut Breeze Property to the Kecks after the Kecks conveyed title to the First Street Property to them, rendering the Meeks allegedly in first material breach of contract. *See Markow v. Polluck*, No. M2008-01720-COA-R3-CV, 2009 WL 4980264, at *5 (Tenn. Ct. App. Dec. 22, 2009) ("When one party to a contract materially breaches the same, is unable to perform, or manifests an intention to no longer be bound by the contract, the non-breaching party is excused from further performance."). Upon careful review, we determine that the trial court did not err in awarding to the Kecks $15,300 without explicitly finding the Meeks in breach of contract because the award was a return of the Kecks' equity in the First Street Property and not an award of damages under a breach of contract claim. *See Pickett v. Pickett*, No. 01-A-01-9503-CH-0011, 1995 WL 517492, at *1 (Tenn. Ct. App. 1995) ("[O]n a theory similar to unjust enrichment . . . a defaulting vendee in a real estate transaction may recover the amounts paid on the purchase price in excess of damages caused by the vendee's breach." (citing *Monts v. Campbell*, No. 83-205-II (Tenn. Ct. App. Apr. 6, 1984)).

## A. Lease Option Contract

Although the Meeks have not raised a separate issue as to whether the trial court properly found that the Kecks exercised their option to purchase the Walnut Breeze Property, we determine this finding to be integral to our review of the trial court's award of equity in the First Street Property. Specifically, the Meeks contend that the Kecks breached the terms of the Lease Agreement, which were conditions of the Kecks' right to purchase the Walnut Breeze Property. The Meeks further argue that the Kecks are

thereby not entitled to any credit advanced toward a purchase that never occurred. The Meeks' argument therefore relies in part on a finding that the Kecks never exercised their option to purchase the Walnut Breeze Property. Upon a thorough review of the record, we conclude that the evidence does not preponderate against the trial court's finding that the Kecks exercised their option to purchase the Walnut Breeze Property when they conveyed title to the First Street Property to the Meeks.

In interpreting a contract, our "initial task is to determine whether the language in the contract is ambiguous." *Ray Bell*, 356 S.W.3d at 386-87 (citing *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002)). "If the contract language is unambiguous, then the parties' intent is determined from the four corners of the contract." *Ray Bell*, 356 S.W.3d at 387 (citing *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998)). When several contracts are executed with reference to each other and substantially at the same time, "the contracts will be read together" if their terms "form integral parts of a single transaction." *Graber v. Graber*, No. W2003-01180-COA-R3-CV, 2003 WL 23099689, at *3 (Tenn. Ct. App. Dec. 31, 2003) (citing *Oman Constr. Co. v. Tenn. Cent. Ry. Co.*, 370 S.W.2d 563, 570 (Tenn. 1963)).

This Court has explained the principles applied to determine whether the contract language is clear or ambiguous as follows:

> The language in dispute must be examined in the context of the entire agreement. *Cocke County Bd. of Highway Commrs. v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985). The language of a contract is ambiguous when its meaning is uncertain and when it can be fairly construed in more than one way. *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975). "A strained construction may not be placed on the language used to find ambiguity where none exists." *Id.*

*Vanbebber v. Roach*, 252 S.W.3d 279, 284 (Tenn. Ct. App. 2007), *perm. app. denied* (Tenn. Mar. 3, 2008). It is well settled that "ambiguities in a contract are to be construed against the party drafting it." *Frank Rudy Heirs Assocs. v. Moore & Assocs., Inc.*, 919 S.W.2d 609, 613 (Tenn. Ct. App. 1995). In interpreting the language of a contract, we are required to use "the usual, natural, and ordinary meaning" of terms. *See Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 526 (Tenn. 2005); *Adkins v. Bluegrass Estates,* 360 S.W.3d 404, 411 (Tenn. Ct. App. 2011). "The parol evidence rule does not permit contracting parties to 'use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract.'" *Staubach*, 160 S.W.3d at 525 (quoting *GRW Enters. v. Davis*, 797 S.W.2d 606, 610 (Tenn. Ct. App. 1990)).

14

In finding that the Kecks had exercised the option to purchase the Walnut Breeze Property during the January 6, 2014 "closing," the trial court stated in its memorandum opinion:

Based on [the Lease Agreement], it's pretty clear that [the Kecks] entered into a lease agreement to rent Walnut Breeze for one year, and that document refers to a contract pending with the closing at a later date, which meant they definitely had the right to live there for at least one year, and then they were going to be hold over after that.

The real estate contract . . . does authorize [the Kecks] to purchase Walnut Breeze for a purchase price of $130,000, and it says, "owner financing through contract for deed at time lease option purchase is exercised," to do it all as soon as possible, but it says, "subject to the transfer meeting the approval of Home Federal Bank."

It's not talking about refinancing or anything of that nature; it's talking about Home Federal Bank saying: Yes, we agree to that this arrangement will be a sale, and then I'm assuming them paying off any balance due and owing on whatever debt might be left at that time.

It makes arrangement to the earnest money deposit of $30,000 being the purchase price, with the trade allowance for the payoff due and owing to Superior Finance, which evidently was about fourteen, seven, so that leaves $15,300 per everyone's testimony.

There was a lot of testimony about the option to purchase. It's my understanding that both parties basically agreed that on January 6th, when [the Kecks] signed the deed to the First Street property, that is when the Walnut Breeze option to purchase was actually exercised.

Now, there's a lot of communication and conversation about credit due to [the Kecks] based upon the monthly payments. It's my understanding, looking at all the documents, that credit and equity and different balancing – the balancing of the numbers would take place at the time of an actual sale. We never really got to that point. So until the sale, which never took place, [the Kecks] were simply leaseholders of the Walnut Breeze property.

Both the trial court's finding that the Kecks exercised their option to purchase the Walnut Breeze Property and the Meeks' argument that the Kecks did not exercise their

15

option are based on a "lease option contract" that is not explicitly outlined in any of the four executed documents. Although none of the documents is titled as a lease option contract, two mention the presence of a "lease option" as though it were a controlling agreement. The Real Estate Contract mentions a "lease option purchase" with respect to a condition of financing for the sale of the Walnut Breeze Property. The Addendum incorporates a "lease option contract," which it states, "shall be a preliminary contract as part of this sales contract," but it does not describe the details of any lease option contract. The Addendum later refers to "payments made under the lease/option contract," which creates an ambiguity as to whether there exists a lease separate from an option contract or whether the two are identical as a "lease option contract." In addition, although the Lease Agreement makes no mention of an option to purchase the Walnut Breeze Property, it does refer to a "Contract governing this agreement." The Sale Contract makes no reference to either a lease or an option agreement.

Considering the four agreements together as "integral parts of a single transaction," *see Graber*, 2003 WL 23099689, at *3, the presence of a lease option contract without any terms specifically outlining that contract creates an ambiguity that warrants the consideration of parol evidence. This Court has held that "when a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract." *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006). We thereby determine that in the instant action, the trial court properly considered parol evidence to ascertain the intent of the parties.

We note at the outset that on appeal, the parties agree that the four documents should be considered together as components of one interrelated transaction. Turning to the parties' testimony, the Kecks each testified that their understanding of the transaction as a whole was that it allowed them to use their equity in the First Street Property as a down payment on purchase of the Walnut Breeze Property, with rent payments under the Lease Agreement to be applied as installments toward the contemplated purchase of the property. Mr. Meek testified that the transaction constituted a sales contract for title to the Walnut Breeze Property with the lease as payment for the Walnut Breeze Property. Both parties thereby agree that the transaction in its entirety essentially constituted a lease with an attached option contract, which can be termed a lease option contract. Ergo, we will refer to the entire interrelated transaction created by the four executed documents as a "Lease Option Contract."

This Court addressed the rules regarding contractual leases with incorporated option contracts in *Kwasniewski v. Lefevers*, No. M2012-01802-COA-R3-CV, 2013 WL 3964788 (Tenn. Ct. App. July 30, 2013). As this Court explained:

An option is a unilateral contract whereby the optioner for a valuable consideration grants the optionee a right to make a contract of purchase but does not bind the optionee to do so; the optionor is bound during the life of the option, but the optionee is not. It is a continuing offer to sell irrevocable during the option period. Its transition into a contract to purchase can be effected only by an unqualified unconditional acceptance in accordance with the terms and time specified.

*Id.* at *4 (quoting *Jones v. Horner*, 260 S.W.2d 198, 199 (Tenn. Ct. App. 1953)).

In the case at bar, the Lease Option Contract does not explicitly set forth the conditions the Kecks would have been required to meet in order to exercise their option to purchase the Walnut Breeze Property. As such, we determine the Meeks' argument that full payment of $130,000 was an unstated condition to be unavailing. As this Court has explained:

The general law of options is not so rigorous as to require a party to close on the property within the option period in order to exercise his rights (unless the contract so specifies), but it does require him to bind himself by an unqualified acceptance before he will be deemed to have validly elected to make the purchase:

An option cannot be enforced as a contract until exercised by acceptance. The acceptance must be unqualified, absolute, positive, without reservation, and according to the terms of the option. An acceptance of an option must be such a compliance with the conditions as to bind both parties, and if it fails to do so, it binds neither.

*Wortham v. W. Meade Corp.*, No. 01A01-9709-CV-00464, 1998 WL 1084399, at *3 (Tenn. Ct. App. June 12, 1998) (quoting *Pinney v. Tarpley*, 686 S.W.2d 574, 580 (Tenn. App. 1984)).

The Lease Option Contract also does not specifically provide what would constitute acceptance, and the parties disagree on what their understanding of acceptance may have entailed. In contrast to the Meeks' argument that payment in full was a requirement of exercising the option to purchase the Walnut Breeze Property, the Kecks contend that their conveyance of title to the First Street Property to the Meeks was an effective acceptance of the ongoing option. We first look to the plain language of the documents comprising the Lease Option Contract in resolving what would constitute an effective acceptance.

17

The Real Estate Contract outlines the sale of the Walnut Breeze Property under sections three and four of that agreement. The document identifies a purchase price of $130,000 for the Walnut Breeze Property, and the typeface lines of the document set forth two potential options for payment, reflected by two check boxes: "All Cash" or "Financed." The "All Cash" box is left blank, in contrast to the "Financed" box marked with an "x," supporting the conclusion that full payment in cash was not a condition of the Kecks' ability to exercise their option to purchase the Walnut Breeze Property.

Section three of the Real Estate Contract provides that financing for the Walnut Breeze Property would be "Owner Financed Through Contract for deed at time lease option purchase is exercised." There are two possible sources for determining what "contract for deed" may mean with respect to the Lease Option Contract: the Real Estate Contract and the Sale Contract. The Sale Contract outlines part of this owner financing, providing that in exchange for delivery of the deed to the First Street Property, the Kecks would be "due credit on [the First Street Property] for the net amount of equity as credit on the purchase price of the property @ Walnut Breeze. . . ." The Sale Contract therefore appears to be the "contract for deed" that the Real Estate Contract refers to as part of the owner financing.

Considering who the "owner" might be in respect to the "Owner Financed" agreement, there are three possibilities based on who held a possessory interest in the property at the time: Mr. Meek, Ms. Meek, and Home Federal Bank. The Lease Agreement states that Mr. Meek "is the fee owner of certain real property," which is the only clarification of "owner" as a defined term in any of the four documents in dispute. Considering these four documents as collectively creating one transaction, we therefore conclude that the Lease Option Contract contemplates Mr. Meek as a private source of financing for the sale of the Walnut Breeze Property. The Lease Option Contract thereby provides for the sale of the Walnut Breeze Property to the Kecks at the time the Kecks would exercise their option to purchase the property, with immediate payment consisting of credit equal to their equity in the First Street Property and with the remaining payment to be financed by Mr. Meek.

The Lease Option Contract is ambiguous as to whether section three in the Real Estate Contract indicates that the Kecks will not convey title to the First Street Property until such time as they choose to exercise the option or that the Kecks will immediately convey title to the First Street Property with the Meeks using that conveyance for financing only if the Kecks choose to exercise the option at a later date. *See Vanbebber*, 252 S.W.3d at 284 ("The language of a contract is ambiguous when its meaning is uncertain and when it can fairly be construed in more than one way."). The Kecks' understanding of the contract relied on the former interpretation because the Kecks

18

indicated that they fully expected to receive title to the Walnut Breeze Property shortly following their conveyance of title to the First Street Property. The Meeks' principal argument on appeal relies on the latter interpretation inasmuch as the Meeks contend that the Kecks merely conveyed title to the First Street Property as nonrefundable credit toward a possible purchase of the Walnut Breeze Property in the future.

As the trial court noted in its judgment, Mr. Meek was the drafting party in this case. Construing the ambiguous language against the drafting party, we conclude that section three of the Real Estate Contract provides that the parties were to act on the Sale Contract at the same time the Kecks exercised their option to purchase the Walnut Breeze Property. *See Frank Rudy Heirs Assocs.,* 919 S.W.2d at 613 ("[A]mbiguities in a contract are to be construed against the party drafting it."). Therefore, we conclude that when the Kecks conveyed title to the First Street Property to the Meeks on January 6, 2014, they were concurrently exercising their contractual right to purchase the Walnut Breeze Property.

Even considering the interpretation of this ambiguity more favorably to the Meeks, meaning that the First Street Property's conveyance was not a condition of acceptance, the Lease Option Contract does not support the Meeks' contention that the Kecks were immediately required to convey title to the First Street Property. According to Mr. Meek, the Lease Option Contract was not valid until the Kecks conveyed title to the First Street Property to the Meeks and thereby "consummated" the transaction. Furthermore, Mr. Meek testified during trial that his understanding of the transaction was that the Kecks had ninety days to convey title to the First Street Property or else the Lease Option Contract would be void. We do not agree with this reasoning.

First, there is no indication in the four documents in dispute that the Lease Option Contract was only enforceable when the Kecks conveyed title to the First Street Property to Mr. Meek. Second, none of the four documents mention the ninety-day requirement that Mr. Meek raised in his testimony. Third, the Kecks indicated their understanding that the First Street Property conveyance was only required when they chose to exercise their option to purchase the Walnut Breeze Property. Fourth, Mr. Meek himself did not consistently testify as to his belief that the Kecks were required to convey title to the First Street Property within ninety days in order to "consummate" the transaction. Specifically, Mr. Meek explained the following on cross-examination:

| The Kecks' Counsel: | So they—but they already had possession of the property because they already had a lease since October 1st; right? |
| --- | --- |
| Mr. Meek: | That's correct. |

19

| | |
|---|---|
| The Kecks' Counsel: | So they didn't get possession because they gave you the [First Street Property]; they had possession because there was a lease in effect? |
| Mr. Meek: | That's right. That lease was in effect until they came in and finished the paperwork and signed over their piece of property to me. |
| The Kecks' Counsel: | Okay. So when they signed over their piece of property to you, the lease was no longer in effect and they were on some sort of purchase agreement? |
| Mr. Meek: | Well, they were on a lease option circumstance. . . . |

Mr. Meek did not clarify what his understanding of the "lease option circumstance" was, and his testimony was unclear as to his understanding of the Kecks' possession of the Walnut Breeze Property. Was the Lease Agreement separate from the "lease option circumstance," meaning that when the Kecks transferred title to the First Street Property, they accepted the option to purchase the Walnut Breeze Property and were no longer subject to a lease? Alternatively, was the Lease Agreement part of the "lease option circumstance," meaning that the Kecks leased the Walnut Breeze Property independently from their conveyance of the First Street Property?

In either circumstance, we conclude that neither the Lease Option Contract nor the conduct of the parties supports the Meeks' contention that the Kecks were required to convey title to the First Street Property either immediately or within ninety days of execution. The trial court questioned Mr. Meek directly as to why he arranged to meet with the Kecks on January 6, 2014, for the Kecks to convey title to the First Street Property to him:

| | |
|---|---|
| Trial Court: | [W]hy did you require the deed signing to the other property on January 6th? |
| Mr. Meek: | That was the completion of our agreement. They lived there the three months knowing that the deal hadn't been closed until they signed that deed over to me and everything was worked out. So they—they—and they knew |

20

that the loan wasn't going to be made by Home Federal. So they had 90 days. And I wrote [Mr. Keck] and told him if he wanted to come in, to come in and close it; otherwise we didn't have a deal.

Although the documents comprising and establishing the Lease Option Contract do not require the Kecks to convey title to the First Street Property to Mr. Meek either immediately or within ninety days, the Real Estate Contract does state that a "closing date" would be determined at a later date. When Mr. Meek contacted the Kecks to inform them that they had ninety days "to come in and close it," he thereby set the deadline for the option to purchase the Walnut Breeze Property. It is not necessary for us to consider whether the Lease Option Contract afforded Mr. Meek the ability to unilaterally determine a deadline for the option to purchase the Walnut Breeze Property because the Kecks agreed to this deadline and met with Mr. Meek on January 6, 2014, in accordance with Mr. Meek's wishes.

We therefore conclude that even if the First Street Property conveyance was not conditional to the Kecks' exercising their option to purchase the Walnut Breeze Property, both parties expressed a sufficient mutual understanding that the Kecks accepted the offer to purchase the Walnut Breeze Property on January 6, 2014, by meeting with Mr. Meek and conveying title to the First Street Property to the Meeks. As such, we conclude that the evidence preponderates in favor of the trial court's finding that "both parties basically agreed that on January 6th, when [the Kecks] signed the deed to the First Street property, that is when the Walnut Breeze option to purchase was actually exercised."

## B. Equity in Walnut Breeze Property

The Meeks assert that the Kecks transferred title to the First Street Property to the Meeks on January 6, 2014, in exchange for credit toward an eventual purchase of the Walnut Breeze Property and not in exchange for an equivalent equity in the Walnut Breeze Property. The Meeks further contend that because the sale of the Walnut Breeze Property never occurred, the Meeks do not owe the Kecks the $15,300 in credit that would have been redeemable only if the Kecks exercised their option to purchase the Walnut Breeze Property. The question of whether the Kecks gained credit or equity in the Walnut Breeze Property with their transfer of title to the First Street Property is essential to an understanding of whether the Kecks retained their right to a credit for that equity under the Lease Option Contract.

The Lease Option Contract refers to equity in three different aspects: (1) equity in the First Street Property, (2) equity in the Walnut Breeze Property under the Sale

21

Contract, and (3) equity in the Walnut Breeze Property under the Lease Agreement. The Sale Contract states that the equity the Kecks already possessed in the First Street Property as of October 1, 2013, was "$30,000.00 less balance owing to Superior Finance," or a total of $15,300. According to the terms of the Sale Contract, the Meeks would have applied the Kecks' $15,300 in equity as credit toward the purchase of the Walnut Breeze Property in exchange for title to the First Street Property. This credit toward the purchase of the Walnut Breeze Property would therefore only become equity in the Walnut Breeze Property if the Kecks exercised their option to purchase the Walnut Breeze Property and used the credit as earnest money and partial payment.

If the Lease Option Contract called for an immediate conveyance of the First Street Property in exchange for credit toward an eventual purchase of the Walnut Breeze Property, the Kecks would have applied that credit toward the purchase price of the Walnut Breeze Property on January 6, 2014, when they decided to exercise their option to purchase the Walnut Breeze Property. However, if the terms of the Lease Option Contract instead were that the First Street Property conveyance was the condition of exercising the option to purchase the Walnut Breeze Property, the Kecks would have applied the credit from the First Street Property's conveyance toward the price of the Walnut Breeze Property on January 6, 2014, when they conveyed the First Street Property to the Meeks. Either way, the credit from title to the First Street Property would have become equity in the Walnut Breeze Property when the Kecks exercised their option to purchase the Walnut Breeze Property.

The third type of equity contemplated in the Lease Option Contract is equity in the Walnut Breeze Property as a result of monthly payments under the Lease Agreement. During trial, the parties indicated their understanding that the payments the Kecks made under the Lease Agreement would be applied directly toward the Walnut Breeze Property mortgage and that the Kecks would acquire the equity those payments accrued when they chose to exercise the option to purchase the Walnut Breeze Property. The trial court did not calculate what this amount may have been, however, and neither party raises the equity earned through monthly payments as an issue on appeal. Therefore, we make no determination concerning any unresolved equity accumulated through monthly payments.

In all instances, the Meeks' distinction between equity and credit relies on the Meeks' prior assertion that the Kecks did not exercise their option to purchase the Walnut Breeze Property. We do not find the Meeks' characterization of the First Street Property's value as "credit" instead of "equity" to be persuasive. In a factually similar case involving a lease with an option to purchase the leased property, this Court explained:

When the option was exercised by the appellee, the lease and all of its incidents, including the obligation to pay rent, was blotted out of existence, and the relation of vendor and vendee was created. The appellee had an equitable interest in the land and equitable title passed to it, subject to the payment of the purchase price. *Chapman Drug Company v. Chapman*, 207 Tenn. 502, 341 S.W.2d 932 (Tenn. 1960).

*Wright v. Universal Tire, Inc.*, 577 S.W.2d 194, 197 (Tenn. Ct. App. 1978), *perm. app. denied* (Tenn. Feb. 12, 1979); *see Dave Williams Printing Co., Inc. v. Wooten*, 644 S.W.2d 403, 407 (Tenn. Ct. App. 1982), *perm. app. denied* (Tenn. Nov. 22, 1982) (citing *Wright* with approval and affirming the trial court's ruling in favor of the optionee). Based on our determination that the trial court did not err when it found that the Kecks exercised their option to purchase the Walnut Breeze Property on January 6, 2014, we further determine that the trial court properly found that the Kecks gained $15,300 in equity in the Walnut Breeze Property on January 6, 2014, when the Kecks conveyed title to the First Street Property to the Meeks under the terms of the Sale Contract.

We agree with the Meeks' assertion that "[t]here can be no recovery for damages on the theory of breach of contract by the party who himself breached the contract." *See United Brake Sys.*, 963 S.W.2d at 756 (quoting *Santa Barbara Capital Corp. v. World Christian Radio Found., Inc.*, 491 S.W.2d 852, 857 (Tenn. Ct. App. 1972)). However, we determine that the trial court's return of the Kecks' equity to them was not premised upon their claim of breach of contract. Although the Kecks did allege in their complaint that the Meeks were liable for damages due to a breach of contract, the Kecks' alternative request for a return of the First Street Property was under theories of fraud, unjust enrichment, and a "right of rescission." The trial court did not specify the theory under which it found the Kecks to be entitled to a return of their equity. This award is consistent, however, with the Kecks' alternate claims for a return of the First Street Property, rather than the claim for $75,000 in compensatory damages under a breach of contract theory.

"We have previously held on a theory similar to unjust enrichment, that a defaulting vendee in a real estate transaction may recover the amounts paid on the purchase price in excess of the damages caused by the vendee's breach." *Pickett*, 1995 WL 517492, at *1. We determine that the Kecks retained their possessory interest in the amount of equity they had acquired in the First Street Property at the time of its conveyance despite their failure to pay rent under the Lease Agreement. We thereby conclude that the trial court did not err by awarding a return of the Kecks' equity without explicitly finding the Meeks in breach of contract because the overall judgment reflected a recovery of the amount paid on the purchase price less damages caused by the Kecks' breach.

23

## C. Liquidated Damages

As an alternative argument, the Meeks also rely in part on a provision for "liquidated damages" in section 14 of the Real Estate Contract, which provides that if the Kecks "fail to perform the covenants herein contained within the time specified," the Meeks would be able to retain "as liquidated damages all sums which have theretofore been paid."[4] Pursuant to this provision, the Meeks argue that they were entitled to keep the $15,300 credited to the Kecks as liquidated damages in addition to receiving the $3,426 they requested in unpaid rent.[5] The trial court declined to enforce the liquidated damages provision contained in the Real Estate Contract in that it awarded to the Kecks their original equity in the First Street Property. The trial court ostensibly found, therefore, that the liquidated damages provision was unenforceable under the circumstances of this case. We conclude that the trial court did not err in declining to award to the Meeks, as liquidated damages, the equity that the Kecks had conveyed in the First Street Property.

Regarding liquidated damages, our Supreme Court has explained:

From our review of the law on liquidated damages, we recognize that there are two important interests at issue: the freedom of parties to bargain for and to agree upon terms such as liquidated damages and the limitations set by public policy. Generally, the parties to a contract are free to agree upon liquidated damages and upon other terms that may not seem desirable or pleasant to outside observers. *See Chapman Drug Co. v. Chapman*, 207 Tenn. 502, 341 S.W.2d 392, 398 (1960); 22 Am. Jur. 2d *Damages* § 686 (1988). In that respect, courts should not interfere in the contract, but should carry out the intentions of the parties and the terms bargained for in the contract, unless those terms violate public policy. *See McKay v. Louisville & N.R. Co.*, 133 Tenn. 590, 182 S.W. 874, 875 (1916)

---

[4] An ambiguity exists as to whether "the covenants herein contained" are covenants contained only in the Real Estate Contract or covenants anywhere in the Lease Option Contract. We do not find it necessary to resolve this ambiguity because the difference is *de minimus* with respect to whether the liquidated damages provision contained in the Real Estate Contract is enforceable.

[5] Although this Court does not apply a retrospective analysis of the appropriateness of liquidated damages, *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 100 (Tenn. 1999), we do note that the Meeks' breach of contract claim for unpaid rent is antithetical to their claim that liquidated damages are proper under the same contract. *See Gross v. McKenna*, No. E2005-02488-COA-R3-CV, 2007 WL 3171155, at *5 (Tenn. Ct. App. Oct. 30, 2007) ("With regard to the liquidated damages clause . . . such clauses are unenforceable where the actual damages caused by a breach are 'readily susceptible to accurate proof,' as is this case." (quoting *Wilson v. Dealy*, 434 S.W.2d 835, 837 (Tenn. 1968)).

(citing *Baltimore & Ohio S.W. Ry. Co. v. Voight*, 176 U.S. 498, 505, 20 S.Ct. 385, 387, 44 L.Ed. 560 (1900)).

* * *

When parties agree to a liquidated damages provision, it is generally presumed that they considered the certainty of liquidated damages to be preferable to the risk of proving actual damages in the event of a breach. 22 Am. Jur. 2d *Damages* § 726.

Liquidated damages permit the parties to allocate business and litigation risks and often serve as part of the contractual bargain. In addition, they lend certainty to the contractual agreement and allow the parties to resolve defaults and other related disputes efficiently, when actual damages are impossible or difficult to measure. C.T. McCormick, *Handbook on the Law of Damages* § 157 (1935).

* * *

We, therefore, adopt a prospective approach for addressing the recovery of liquidated damages. Under this approach, courts must focus on the intentions of the parties based upon the language in the contract and the circumstances that existed at the time of contract formation. Those circumstances include: whether the liquidated sum was a reasonable estimate of potential damages and whether actual damages were indeterminable or difficult to measure at the time the parties entered into the contract. *See V.L. Nicholson* [*Co. v. Transcon Inv. & Fin. Ltd.*], 595 S.W.2d [474,] 484 [(Tenn. 1980)]. If the provision satisfies those factors and reflects the parties' intentions to compensate in the event of a breach, then the provision will be upheld as a reasonable agreement for liquidated damages. However, if the provision and circumstances indicate that the parties intended merely to penalize for a breach of contract, then the provision is unenforceable as against public policy.

*Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 99-100 (Tenn. 1999) (footnote omitted). *See Allmand v. Pavletic*, 292 S.W.3d 618, 630-31 (Tenn. 2009) (reaffirming and applying the principles of liquidated damages from *Guiliano*); *Hensley v. Cocke Farmer's Coop.*, No. E2014-01775-COA-R3-CV, 2015 WL 5121142, at *5-6 (Tenn. Ct. App. Aug. 31, 2015), *perm. app. denied* (Tenn. Jan. 21, 2016) (applying the principles of liquidated damages from *Guiliano* in a case involving a contractual provision for severance pay).

25

In resolving the enforceability of the liquidated damages provision in the Real Estate Contract, we find that this Court's relevant analysis in *Harmon v. Eggers* is directly on point. *See* 699 S.W.2d 159 (Tenn. Ct. App. 1985), *perm. app. denied* (Tenn. July 8, 1985), *overruled on other grounds by Guiliano*, 995 S.W.2d at 99-100 (overruling the "retrospective approach" of addressing the recovery of liquidated damages and adopting a solely "prospective approach"). In *Harmon*, this Court summarized the facts as follows in pertinent part:

> In January, 1979, the Plaintiffs-Appellants, Gaylon and Phyllis Harmon, entered into a contract with Defendant Robert C. Eggers (who was acting both for himself and as agent for other defendant family members) for the purchase of a house and lot in the Foothills Estates Subdivision in Blount County, Tennessee. As part of the $63,000 purchase price, the Plaintiffs paid $5,000 in cash and deeded to the Defendants certain other real property located on Highway 411 (hereafter referred to as the "411 property") in Blount County.

> The Plaintiffs received a $27,000 credit for their transfer of the 411 property. This amount represented a $42,000 value for the property, less a $15,000 mortgage to Blount National Bank which was assumed by the Defendants. This made a total payment of $32,000 on the $63,000 purchase price.

> The Foothills Estates property was encumbered by a mortgage in favor of First Federal Savings and Loan Association of Maryville. It appears the Plaintiffs were unable to assume the First Federal loan, and the parties instead proceeded with a contract for deed as a means of financing the transaction.

> This contract was executed on February 15, 1979, and provided for the payment of the remaining $31,000 to the Defendants in 72 monthly installments of $379.85 each. At the conclusion of the payments, the sellers then were to deed the property to the Plaintiffs.

> The contract also provided that

>> Failure of the Purchasers to make any monthly installment when due will be a breach of this contract for which the Sellers may re-enter and take possession of the premises described herein without any notice whatsoever from the Sellers to the Purchasers, and all monies paid by the

26

Purchasers to the Sellers shall be retained by the Sellers as liquidated damages for the breach of this contract and as rent for the premises.

In conjunction with the execution of the contract for deed, Mr. Harmon also signed a "Buyer's Closing Statement," which, in part, reflected the $27,000 credit for the 411 property, a cash payment of $5606.31, as well as the remaining purchase price of $31,000.

Subsequent to closing, the Plaintiffs moved into the Foothills Estates property. They made the monthly payments due the Defendants for four months, then stopped paying, allegedly because of a dispute over an improperly functioning drain field on the property.

In September of 1979, the Plaintiffs filed suit in the Blount County Circuit Court to have the 411 property returned to them.

Thereafter, in December the Defendants, having not received monthly payments from the Plaintiffs for six months, commenced an unlawful detainer action in the General Sessions Court to have the occupants evicted from the property.

*Harmon*, 699 S.W.2d at 160.

The trial court in *Harmon* dismissed the plaintiff's case, reasoning, *inter alia*, that the plaintiff was the breaching party and that the liquidated damages provision was controlling. *Id.* at 161. On appeal, this Court reversed the trial court's dismissal by determining that the liquidated damages provision was punitive and therefore unenforceable. *Id.* at 164.

The facts in *Harmon*, as with this case, involve an agreement whereby a purchaser made monthly payments toward the purchase price of a parcel of improved real estate with an initial deposit of credit from a conveyance of encumbered real property. *Id.* at 160. Additionally, the purchaser in *Harmon* committed the first material breach of contract by defaulting on the monthly payments, and the contract in *Harmon* provided that any breach by nonpayment would result in a forfeiture of all credit from prior payments as liquidated damages. *Id.* The Tennessee Supreme Court has determined that such a provision for liquidated damages is unenforceable when it is punitive and not reflective of a reasonable measure of damages. *See Guiliano*, 995 S.W.2d at 100-01 (adopting a "prospective approach for addressing the recovery of liquidated damages" in which recovery requires that at the time the parties entered into the contract, the

liquidated damages sum must have been "a reasonable estimate of potential damages" and actual damages must have been "indeterminable or difficult to measure").

In this case, the Meeks characterize the Lease Option Contract in an identical manner to the contract in *Harmon*, which is that of a payment plan toward a purchase price with any breach due to nonpayment resulting in forfeiture of credit from all prior payments as liquidated damages. Specifically, Mr. Meek testified in response to direct questions from the trial court as follows:

Trial Court:      Do you agree or disagree that [the Kecks] accumulated any equity in any property since October 1st of 2013?

Mr. Meek:      I disagree to the extent that yes, they would have— they would accumulate it based upon our agreement, but when they failed to—to go through with our agreement, then they made the choice to walk away. I didn't.

* * *

Trial Court:      So as you sit here right now today, do you agree or disagree that you owe [the Kecks] any money?

Mr. Meek:      I disagree.

In contrast to the Meeks' contention, we determine that the liquidated damages provision in the Real Estate Contact is no different in punitive effect than the respective liquidated damages provision in *Harmon*. Furthermore, we determine that the evidence does not demonstrate that the actual amount of damages resulting from a breach in the Lease Agreement would have been difficult to reasonably estimate. *See Anesthesia Med. Grp., P.C. v. Chandler*, No. M2005-00034-COA-R3-CV, 2007 WL 412323, at *9 (Tenn. Ct. App. Feb. 6, 2007) ("The law continues to be that a liquidated damages provision will be upheld if the amount of such damages bears a reasonable relationship to the amount of actual damages that would likely be sustained in the event of a breach and if the actual amount of damages would be difficult to determine or prove." (citing *Guiliano*, 995 S.W.2d at 98)). We conclude that in the instant case, as in *Harmon*, "the 'liquidated damages' clause, being nothing more than or less than a forfeiture/penalty, is not to be given effect under the existing circumstances." *See Harmon*, 699 S.W.2d at 164. The Meeks are not entitled to relief on this issue.

## D. Trial Court's Interpretation of Equity

The Meeks also argue that the trial court's judgment was not proper because the trial court "rewrote the contract for the parties" in an "attempt to do equity." In support of this argument, the Meeks rely in part on *Cameron Gen. Contractors, Inc. v. Kingston Pike, LLC*, 370 S.W.3d 341, 346 (Tenn. Ct. App. 2011), wherein this Court stated: "It is not the role of the courts, even courts of equity, to rewrite contracts for dissatisfied parties." The Meeks note two statements in the trial court's memorandum opinion as indicating that the trial court improperly sought to impose equitable principles concerning the parties' contract. Specifically, the Meeks cite the trial court's statement that it was "trying to balance equities and be as fair with everybody" as it could and the trial court's statement that it thought "the fair and right thing to do is to enter a judgment against [the Meeks.]" Upon a thorough review of the record and the applicable law, we do not agree with the Meeks' interpretation of the trial court's memorandum opinion.

The Meeks' characterization of the trial court's statement that it was "trying to balance equities" depends on the meaning of "equity" in the context of the trial court's memorandum opinion. Relative to the facts of this case, "equity" can either be "the judicial prevention of hardship that would otherwise ensue from the literal interpretation of a legal instrument" or "[a]n ownership interest in property." BLACK'S LAW DICTIONARY 656-57 (10th ed. 2014). We determine that under either definition, the trial court's ruling was based on the proper legal standard under the circumstances of this case.

First, this case involves an exchange of equities as ownership interests in property, and the trial court's judgment in favor of the Kecks directly relates to the amount of equity the Kecks held in the First Street Property. We note that the trial court also stated in its memorandum opinion that "looking at all the documents, that credit and equity and different balancing – the balancing of the numbers would take place at the time of an actual sale. We never really got to that point." In this context, we find that the trial court's attempt to "balance equities" may be interpreted in relation to the parties' respective ownership interests in each property and not as an attempt to "create or rewrite a contract simply because its terms are harsh or because one of the parties was unwise in agreeing to them." *See Cameron Gen. Contractors*, 370 S.W.3d at 346 (quoting *Towe Iron Works, Inc. v. Towe*, 243 S.W.3d 562, 569 (Tenn. Ct. App. 2007)).

Second, this Court's ruling in *Cameron Gen. Contractors* is factually distinguishable from the instant action. Specifically, this Court held in *Cameron Gen. Contractors* that "it is not the role of courts, even courts of equity, to rewrite contracts for dissatisfied parties" unless the contract is invalid or unenforceable. *Cameron Gen. Contractors*, 370 S.W.3d at 346. A finding of mistake or fraud is a specific instance

29

when a contract may be invalid or unenforceable. *Id.* As this Court has consistently held, when a liquidated damages provision is equivalent to a forfeiture or penalty, that specific provision will not be enforceable as a matter of public policy. *See Guiliano*, 995 S.W.2d at 101 ("[I]f the [liquidated damages] provision and circumstances indicate that the parties intended merely to penalize for a breach of contract, then the provision is unenforceable as against public policy."); *Anesthesia Med. Grp.*, 2007 WL 412323, at *9 n.7 ("[L]iquidated damages will not be upheld if they are deemed to constitute a penalty against the breaching party rather than a reasonable way to guarantee compensation for damages to the non-breaching party." (citing *Guiliano*, 995 S.W.2d at 98)). The facts in *Cameron Gen. Contractors* involved a contract that was both valid and enforceable while this case involves a contract with a specific provision that is not enforceable. We thereby determine that the trial court did not improperly attempt to apply equitable principles regarding the parties' contract by declining to enforce the liquidated damages provision in the Real Estate Contract.

We conclude that the trial court did not err when it awarded the $11,874 overall judgment in favor of the Kecks without explicitly finding the Meeks in breach of contract. This amount is appropriately based on the difference between the amount of equity the Kecks accumulated in the Walnut Breeze Property through their conveyance of the First Street Property and the Meeks' damages resulting from the breach of contract. *See Pickett*, 1995 WL 517492, at *1 (awarding monetary judgment to a breaching vendee based on an identical metric). As such, we do not agree with the Meeks' assertion that the Kecks are not entitled to recovery, as the first to breach the Lease Option Contract, because the trial court's award was a return of equity agreed upon by the terms of the Lease Option Contract and was not premised on the Kecks' breach of contract claim.

## VII. Attorney's Fees

The Meeks further contend that the trial court erred by declining to grant attorney's fees to them after finding that the Kecks were in breach of the Lease Agreement because the Lease Agreement entitled the Meeks to reasonable attorney's fees when pursuing a claim for unpaid rent. In contrast, the Kecks contend that the trial court did not err by declining to award attorney's fees because each party prevailed in part. The Kecks maintain that the Real Estate Contract entitles the prevailing party to reasonable attorney's fees on a claim arising out of that agreement and that they prevailed in their claim to recover their equity in the First Street Property. Upon our thorough review of the record, we determine that the trial court erred by declining to award attorney's fees pursuant to the applicable contract provisions.

Tennessee generally adheres to the "American Rule" of recovery for attorney's fees, under which "attorneys' fees are not recoverable in the absence of a statute or

30

contract *specifically* providing for such recovery . . . ." *Cracker Barrel*, 284 S.W.3d at 309 (quoting *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985)). As our Supreme Court has explained:

> Our courts long have observed at the trial court level that parties are contractually *entitled* to recover their reasonable attorney's fees when they have an agreement that provides the prevailing party in a litigation is entitled to such fees. See, e.g., Seals v. Life Inv'rs Ins. Co. of Am., No. M2002-01753-COA-R3-CV, 2003 WL 23093844, at \*4 (Tenn. Ct. App. Dec. 30, 2003); Hosier v. Crye-Leike Commercial, Inc., No. M2000-01182-COA-R3-CV, 2001 WL 799740, at \*6 (Tenn. Ct. App. July 17, 2001). In such cases, the trial court does not have the discretion to set aside the parties' agreement and supplant it with its own judgment. See Christenberry v. Tipton, 160 S.W.3d 487, 494 (Tenn. 2005) ("A court 'cannot under the guise of construction make a new and different contract for the parties.'") (quoting Memphis Furniture Mfg. Co. v. Am. Cas. Co., 480 S.W.2d 531, 533 (Tenn. 1972)). The sole discretionary judgment that the trial court may make is to determine the amount of attorney's fees that is reasonable within the circumstances.

*Eberbach v. Eberbach*, 535 S.W.3d 467, 478 (Tenn. 2017). Thus, if the parties' contract provided for attorney's fee awards under certain circumstances, those provisions must be enforced.

In this case, the documents comprising and forming the Lease Option Contract contain two separate provisions for a recovery of reasonable attorney's fees under certain circumstances. The Meeks brought their claim before the trial court in an attempt to recover unpaid rent and as such were entitled to attorney's fees pursuant to section 23 of the Lease Agreement. The Kecks initiated their claim in order to, *inter alia*, recover their equity in the Walnut Breeze Property, which is a claim "arising out of" the exercise of their option to purchase the Walnut Breeze Property. Pursuant to section 14 of the Real Estate Contract, the Kecks are entitled to reasonable attorney's fees as the prevailing party on that claim.

We note that the Kecks have not raised the issue of the trial court's denial of their attorney's fees on appeal. Additionally, the Meeks' assignment of error is specifically the trial court's refusal to award attorney's fees to them under the terms of the Lease Agreement without mention of any award to the Kecks. The Meeks' argument on appeal is, however, that the trial court erred by disregarding the terms of the overarching contract and declining to award reasonable attorney's fees under those terms. Upon an examination of the documents comprising the Lease Option Contract, we determine that

the provision entitling the Meeks to some award of attorney's fees cannot be read in isolation without consideration of the provision entitling the Kecks to some award of attorney's fees in apparent opposition. We have therefore included the provision entitling the Kecks to some award of attorney's fees in our analysis of the Meeks' assignment of error because the provision is integral to resolving the specific issue on appeal.

As a result, we determine that the trial court erred by declining to award to either party attorney's fees as contemplated in the Lease Option Contract. However, consideration of what portion of each party's attorney's fees can be attributed to the prosecution or defense of each claim and the respective amounts of reasonable fees must be remanded for the trial court to determine because the record contains no evidence in this regard. We therefore reverse the trial court's denial of attorney's fees and remand for an evidentiary hearing to determine the amount of reasonable attorney's fees due to each party under the contract and entry of an additional money judgment as necessary. Additionally, we note that because neither party has requested attorney's fees on appeal, no such fees may be granted. *See Killingsworth v. Ted Russell Ford, Inc.*, 205 S.W.3d 406, 411 (Tenn. 2006) ("An award of attorney's fees generated in pursuing the appeal is a form of relief; the rule requires it to be stated." (citing Tenn. R. App. 27(a))).

## VIII. Conclusion

Having concluded that the Lease Option Contract provides that each party is entitled to some award of reasonable attorney's fees, we reverse the portion of the trial court's judgment declining an award of attorney's fees. We affirm the trial court's judgment in all other respects. We remand to the trial court, pursuant to applicable law, for an evidentiary hearing to determine the amount of reasonable attorney's fees due to each party, for entry of an additional money judgment as necessary, and for collection of costs assessed below. The costs on appeal are taxed one-half to the appellants, E.G. Meek, Sr., and Shirley T. Meek, and one-half to the appellees, Shawn L. Keck and Marcella H. Keck.

_____
THOMAS R. FRIERSON, II, JUDGE